**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ABT BUILDING PRODUCTS
CORPORATION; ABTCO,
INCORPORATED,

*Plaintiffs-Appellees,*

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH,
INCORPORATED,

*Defendant-Appellant.*

No. 05-1739

COMPLEX INSURANCE CLAIMS
LITIGATION ASSOCIATION,
*Amicus Supporting Appellant.*

Appeal from the United States District Court
for the Western District of North Carolina, at Statesville.
Richard L. Voorhees, District Judge.
(CA-01-100)

Argued: May 25, 2006

Decided: December 19, 2006

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

Affirmed by published opinion. Judge King wrote the majority opinion, in which Judge Wilkinson joined. Judge Niemeyer wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Jeffrey A. Goldwater, BOLLINGER, RUBERRY & GARVEY, Chicago, Illinois, for Appellant. Steven John Roman, DICKSTEIN, SHAPIRO, MORIN & OSHINSKY, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Clay H. Phillips, Carol L. Johnson, Sharon Rice, BOLLINGER, RUBERRY & GARVEY, Chicago, Illinois; John M. Claytor, Elizabeth E. S. Skilling, HARMAN, CLAYTOR, CORRIGAN & WELLMAN, Glen Allen, Virginia, for Appellant. Robin L. Cohen, DICKSTEIN, SHAPIRO, MORIN & OSHINSKY, L.L.P., New York, New York; James H. Kelly, Jr., Susan H. Boyles, KILPATRICK STOCKTON, L.L.P., Winston-Salem, North Carolina, for Appellees. Laura A. Foggan, John C. Yang, Thomas S. Garrett, WILEY, REIN & FIELDING, L.L.P., Washington, D.C., for Amicus Supporting Appellant.

**OPINION**

KING, Circuit Judge:

National Union Fire Insurance Company of Pittsburgh, Incorporated ("National Union"), seeks appellate relief from the 2004 Judgment entered against it in the Western District of North Carolina, following a jury trial on claims made by its insureds, ABT Building Products Corporation and ABTco, Incorporated (collectively "ABT").[1] The Judgment awarded ABT compensatory damages in the sum of $2.5 million for National Union's breach of its duty to defend, declaratory relief on National Union's indemnity obligations to ABT, treble damages under the North Carolina Unfair and Deceptive Trade Practices Act (the "UDTPA") in the sum of $11.7 million, and attorneys' fees of nearly $2 million under the UDTPA. On appeal, National Union makes the following contentions: (1) that the district court erred in failing to grant judgment as a matter of law on ABT's claim

---

[1]In February 1999, an entity called Louisiana-Pacific Corporation acquired ABT Building Products Corporation and ABTco, Incorporated. Although the parties and the court refer to "ABT" and "Louisiana-Pacific" interchangeably, we refer to them collectively as "ABT."

that National Union had breached a duty to defend ABT; (2) that the court erred in failing to grant judgment as a matter of law on ABT's claim that National Union was obliged to indemnify ABT; (3) that the court erred in failing to grant judgment as a matter of law on ABT's claim that National Union had violated the UDTPA; and (4) that the court erred in awarding attorneys' fees to ABT. As explained below, we reject each of these contentions and affirm.

I.

A.

On June 14, 2001, ABT initiated this civil action in the Western District of North Carolina, alleging in its Complaint five separate causes of action against its insurer, National Union. ABT's claims centered on National Union's conduct relating to a series of underlying product liability actions involving hardboard siding manufactured by ABT (the "underlying actions").[2] First, ABT sought a declaration that National Union was obliged to indemnify it in connection with the underlying actions (the "Indemnification Claim"). Second, ABT sought damages for National Union's alleged breach of its contractual obligations, under insurance policies it had issued to ABT, in failing to defend ABT in the underlying actions (the "Failure to Defend Claim"). Third, the Complaint sought damages for National Union's alleged conduct in its handling of ABT's claims for defense and indemnification, asserting that such conduct was willful, malicious, and in bad faith (the "Bad Faith Claim"). Fourth, ABT alleged that National Union, as a result of its willful, malicious, and bad faith conduct, was liable to ABT for punitive damages (the "Punitive Damages Claim"). Finally, the Complaint alleged that National Union's conduct in its denial and handling of ABT's claims for defense and indemnification contravened the UDTPA (the "UDTPA Claim"). In conjunction with these claims, ABT sought declaratory relief on its Indemnification Claim; compensatory damages on its Failure to Defend Claim; compensatory and punitive damages on its Bad Faith

---

[2]The underlying actions referred to in the Complaint consist of eleven separate class action proceedings and twenty-one individual lawsuits, which had been instituted on behalf of owners of homes on which ABT-manufactured hardboard siding had been installed.

and Punitive Damages Claims; and treble damages, plus attorneys' fees and other relief, on its UDTPA Claim.

After nearly three years of extensive pre-trial proceedings, a jury trial was conducted by the district court in Statesville, North Carolina, in June of 2004. As explained below, the resulting verdict was in favor of ABT and gives rise to this appeal.

### B.

The evidence presented by the parties in the nine-day jury trial consisted of the testimony of approximately sixteen witnesses plus an array of exhibits. In its evidentiary presentation, ABT emphasized two factual underpinnings of its claims against National Union: (1) that National Union had failed in bad faith to defend and indemnify ABT in connection with the underlying actions; and (2) that National Union had intentionally sold and issued to ABT a new liability insurance policy covering a two-year period for which ABT was already insured by National Union, and that the new policy narrowed ABT's coverage and more than doubled its annual premium. The jury, after hearing and considering the trial evidence and instructions on the applicable legal principles, received and completed a Verdict Form of nearly four pages (the "Verdict").[3] The Verdict resolved the disputes between the parties, largely in favor of ABT. The factual predicate of the Verdict, as drawn from the trial evidence, is summarized as follows.[4]

### 1.

ABT manufactures hardboard siding, a wood-based product that is sold and affixed to the exteriors of homes, at a plant it operates in western North Carolina. The plaintiffs in the underlying actions, which were filed beginning in 1995, had purchased and installed

---

[3]The Verdict is found at J.A. 2063-66. (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

[4]Our statement of the relevant factual underpinnings of this dispute summarizes the evidence in the light most favorable to ABT. *See Babcock v. BellSouth Adver. & Publ'g Corp.*, 348 F.3d 73, 75 n.1 (4th Cir. 2003).

hardboard siding manufactured and sold by ABT. They alleged, inter alia, that the siding, when exposed to moisture, humidity, and other normal climatic conditions, absorbed moisture and prematurely rotted and deteriorated. Many of the plaintiffs also claimed that those problems had, in turn, resulted in consequential damages to other parts of their homes.

During the period from January 1, 1997, to January 31, 1998, ABT was covered by a commercial general liability insurance policy issued by Employers Insurance of Wausau (the "1997 Wausau Policy"). The 1997 Wausau Policy was ABT's primary liability insurance policy for the period of its coverage, and it provided coverage to ABT for defense and indemnity on liability claims made by purchasers of its products. The Policy contained a limit of $1 million per occurrence, obligated Wausau to defend ABT in connection with covered claims, and provided that the expenses Wausau incurred in the defense of any lawsuits or claims would be in addition to the $1 million per occurrence limit. Although several of the underlying actions were pending when the 1997 Wausau Policy was issued, it did not exclude claims relating to defective siding manufactured by ABT.

During the coverage period of the 1997 Wausau Policy, ABT was also insured under a commercial general liability policy issued by National Union (the "1997 NU Policy").[5] The 1997 NU Policy was an umbrella liability policy, requiring National Union to indemnify ABT for any liabilities in excess of the limits of ABT's underlying insurance (such as the 1997 Wausau Policy), up to $25 million. Pursuant to the 1997 NU Policy, National Union was obliged to defend ABT against covered claims when ABT's underlying insurance had "been exhausted by payment of claims." 1997 NU Policy § II.A.1. Under the terms of the 1997 NU Policy, ABT agreed that, even if it failed to keep its underlying insurance in full force and effect for the coverage period of the Policy, National Union's defense and indemnity obligations to ABT would be measured as if ABT's underlying insurance had remained in effect (the "Underlying Insurance Clause"). *See id.* § VI.I. As relevant, the 1997 NU Policy covered "Property Damage . . . caused by an Occurrence." *Id.* § I.[6] It specifically

---

[5]The 1997 NU Policy is found at J.A. 1408-45.

[6]As pertinent here, the 1997 NU Policy defines "Property Damage" as "[p]hysical injury to tangible property, including all resulting loss of use

excluded from coverage "Property Damage to Your Product arising out of it or any part of it" (the "Your Product Exclusion"). *See id.* § V.F.[7] And, like the 1997 Wausau Policy, the 1997 NU Policy did not exclude the coverage of claims against ABT relating to its manufacture of hardboard siding.

The 1997 NU Policy was initially issued for the thirteen-month period from January 1, 1997, to January 31, 1998. This coverage period was soon identified as erroneous, however, in that National Union and ABT had agreed that the Policy would cover a thirty-seven-month period. When ABT notified National Union of the coverage period error, the 1997 NU Policy's "Endorsement #012" was issued by National Union. That Endorsement, in conformity with the earlier agreement, extended the coverage period of the 1997 NU Policy for the proper thirty-seven-month period, through January 31, 2000.

On January 14, 1998, Wausau notified ABT that it planned to cancel ABT's primary liability insurance coverage under the 1997 Wausau Policy, which was scheduled to expire seventeen days later, on January 31, 1998. In order to comply with the applicable legal requirements for its cancellation decision, Wausau was obliged to provide ninety days' notice to ABT. As a result, it issued a "stub," or extension, policy that extended the terms of the 1997 Wausau Policy for the three-month period from January 31, 1998, to May 1, 1998 (the "1998 Wausau Stub Policy"). Wausau then issued a new primary liability policy to ABT — which excluded from coverage any and all claims arising from ABT's manufacture and sale of hardboard siding — effective for the nine-month period from May 1, 1998, through January 31, 1999 (the "1998 Wausau Policy").

---

of that property." 1997 NU Policy § IV.K.1. It defines an "Occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in . . . Property Damage neither expected nor intended from the standpoint of the insured." *Id.* § IV.H.1. It also provides that "[a]ll such exposure to substantially the same general conditions shall be considered as arising out of one Occurrence." *Id.*

[7]The 1997 NU Policy defines "Your Product" as "[a]ny goods or products . . . manufactured [or] sold . . . by . . . you." 1997 NU Policy § IV.M.1.

2.

In January 1998, National Union underwriter Paul Rovelli assumed responsibility for his company's ABT account. Initially, Rovelli was unaware of National Union's issuance of Endorsement #012, which had extended the 1997 NU Policy's coverage period from thirteen to thirty-seven months. Thus, in early 1998, under the mistaken belief that the 1997 NU Policy would expire after thirteen months (on January 31, 1998), Rovelli began the process of underwriting a new National Union policy to provide general liability coverage for ABT.

The sequence of events that followed Rovelli's assumption of responsibility for the ABT account was revealed to the jury in an email that Rovelli had prepared and forwarded to his superiors at National Union on February 4, 1998 (the "Rovelli Email," or the "Email").[8] As he related therein, "after I requested renewal information, I noticed that buried within the policy were two endorsements, one giving it a multi-year term from 1/01/97 to [1/31/2000], and the other providing annual installments of $58,980." Pl.'s Ex. 46. Rovelli was thus aware, early in his underwriting process, that there was no need to re-underwrite ABT's umbrella liability coverage, since the 1997 NU Policy did not expire for another two years. He nonetheless continued the underwriting process, explaining in the Email that "I started to look into the file [and] noticed that there were class-actions

---

[8]The Rovelli Email was admitted into evidence as Plaintiff's Exhibit 46. It specified the following:

> As the policy looked on the system and on the Dec page, I had originally assumed it was a one year deal. However, after I requested renewal information, I noticed that buried within the policy were two endorsements, one giving it a multi-year term from 1/01/97 to [1/31/2000], and the other providing annual installments of $58,980. I started to look into the file, noticed that there were class-actions outstanding. My next step was with the broker, who was also unaware that this was a multi-year policy. I received and reviewed their annual report and noticed not only a reoccurrence of the class-actions but a significant change in exposure, which was not given as a caveat in the policy, but I underwrote anyway.

Pl.'s Ex. 46.

outstanding." *Id.* Although ABT had disclosed to National Union the existence of the underlying actions in its application for the 1997 NU Policy, Rovelli (in his efforts to re-underwrite ABT's coverage) became concerned that National Union had substantially underestimated its exposure to defective siding claims.

Rovelli decided to investigate the matter further and, in so doing, contacted the insurance broker that had arranged the 1997 NU Policy (Marsh & McLennan, Inc.), requesting further financial information on ABT. Rovelli then "received and reviewed [ABT's] annual report and noticed not only a reoccurrence of the class-actions but a significant change in exposure." Pl.'s Ex. 46. Rovelli thus realized, when he composed the Email and sent it to his colleagues at National Union, that ABT would likely face additional defective siding claims in the remaining two coverage years of the 1997 NU Policy, and that there was, unfortunately for National Union, no "caveat in the policy" allowing National Union to avoid its defense and indemnification obligations on those claims. *Id.*

Importantly, Rovelli knew at the time he prepared and sent the Email that the 1997 NU Policy, even after Endorsement #012 was issued, made it appear that its coverage period was only thirteen months and would expire on January 31, 1998. As he wrote to his superiors in the Email, "the policy looked on the system and on the Dec[larations] page" as if it were "a one-year deal." Pl.'s Ex. 46. The declarations page, in other words, had not been amended to reflect Endorsement #012's two-year extension of ABT's coverage period under the 1997 NU Policy, and the Endorsement itself was, according to Rovelli, "buried within the policy." *Id.*

When Rovelli conveyed the foregoing information to his superiors at National Union, they immediately grasped the potential magnitude of National Union's defense and indemnity obligations to ABT under the 1997 NU Policy. One of those officials, Ken Gregnoli, a Vice President for the Excess Casualty Department at AIG (National Union's parent company) testified that "it was obvious to me that the umbrella was going to be impacted by these hardboard siding claims." J.A. 887. He recalled at trial that his conclusion at the time was that National Union was "going to pay substantially." *Id.* at 887-88. Gregnoli further acknowledged in his trial testimony that, in his view,

National Union would also have to pay "a significant amount of money into defending these type of claims." *Id.* at 888-89.

Rovelli's superiors shared his understanding that the 1997 NU Policy afforded National Union no means of avoiding its liability to ABT on the underlying actions. For example, John Schumacher, the President of AIG's underwriting affiliate (American Home Assurance Company) and the highest-ranking official involved in the decision to sell ABT a redundant policy, testified at trial concerning that decision. When asked whether insurance companies were entitled to re-underwrite coverage in the middle of a multi-year policy period, Schumacher testified: "You know, I've seen insurance carriers try to cancel a policy, not often but occasionally, midterm, and they get sued. They get sued big time and generally lose." J.A. 864. Schumacher also testified that he left his position as President of American Home in part because some AIG officials had not been forthright with policyholders.

Ultimately, despite knowing that ABT was already covered under the 1997 NU Policy for hardboard siding claims through January 31, 2000, and that National Union could not cancel ABT's coverage under the Policy at an earlier date, National Union decided, as Rovelli explained in the Email and reiterated in his trial testimony, to "underwr[i]te anyway." Pl.'s Ex. 46; J.A. 841. National Union thereafter required ABT to purchase an umbrella liability insurance policy for the twenty-four-month period from January 31, 1998, to January 31, 2000 (the "1998 NU Policy"). For this new policy — which provided overlapping coverage to ABT for the final two years of the 1997 NU Policy's coverage period — National Union charged ABT a premium of $135,000 per year, more than double the annual premium it was already being charged for the 1997 NU Policy. More significantly, the 1998 NU Policy eliminated National Union's duties to defend and indemnify ABT with respect to hardboard siding claims. And, despite requiring ABT to purchase the 1998 NU Policy, National Union left the 1997 NU Policy in effect.

3.

a.

In 1997, ABT and the plaintiffs in the underlying actions initiated settlement negotiations on the claims against ABT in those actions and with respect to other potential defective siding claims. These efforts intensified in 1999, and counsel for ABT and the plaintiffs agreed that a national class action pending in an Alabama state court (styled as *Foster v. ABTco, Inc.*, in the Circuit Court of Choctaw County) was the appropriate vehicle by which to resolve their disputes. During the course of these lengthy settlement negotiations, ABT kept Wausau, National Union, and its other insurers fully apprised of its efforts, and it provided its insurers with a series of draft settlement proposals that were developed in the negotiations process.[9]

In connection with these settlement negotiations, an analysis was conducted — at the request of ABT's insurers — to assess the potential damages ABT faced in the underlying actions. The expert retained for that purpose, Dr. Michael Sullivan, estimated the total cost of the proposed settlement to be $41.6 million, and he presented his views to ABT and its insurers in the fall of 1999.[10] When those present asked Sullivan for an estimate of the likely consequential damages if the settlement negotiations failed and the underlying actions went to trial, Dr. Sullivan opined that such damages to manufactured homes alone would be $87.7 million.

Wausau initially disputed its contractual obligations, under the 1997 Wausau Policy and the 1998 Wausau Stub Policy, to defend and indemnify ABT in the underlying actions. On November 4, 1999,

---

[9]Insurers other than Wausau and National Union provided ABT with liability coverage for periods before January 1, 1997. Because many of the underlying actions related, at least in part, to hardboard siding that had been installed before January 1, 1997, ABT's insurers for those earlier periods were kept abreast of the settlement negotiations on the underlying claims.

[10]By the time of the trial of this case, Dr. Sullivan had revised his estimate of the total cost of the proposed settlement slightly upward, to $42.8 million.

however, ABT and Wausau reached a settlement agreement (the "Wausau Settlement") under which Wausau agreed to pay ABT the sum of $1.5 million "in compromise of disputed claims" (the "Wausau Settlement Payment"), and to continue to pay its share of defense costs through July 31, 1999. Wausau Settlement §§ III, IV.[11] Pursuant thereto, ABT agreed to pay Wausau's share of defense costs incurred after July 31, 1999. Of the $1.5 million ABT received from Wausau under the Wausau Settlement, $1,147,058.83 was allocated to the 1997 Wausau Policy, and the remaining $352,941.17 was allocated to the 1998 Wausau Stub Policy. *See id.* § VI.

On September 21, 2000, the Alabama state court approved the settlement of the underlying actions in the *Foster* class action litigation (the "*Foster* Settlement").[12] The *Foster* Settlement served as a global resolution of the underlying actions and barred any future claims against ABT by settlement class members who did not opt out. It released all claims against ABT in the underlying actions, including claims for consequential damages, in exchange for payments to be made by ABT through an agreed-upon claims program. This claims program, in which settlement class members may participate at any time within twenty-five years of the installation of defective siding, requires, inter alia, the submission of a claim to ABT, along with photographs sufficient to permit a determination of the square footage of a class member's damaged siding. The *Foster* Settlement establishes a rate of compensation, which it terms "Replacement Cost," that includes the costs of all materials, labor, and incidentals necessary to replace defective siding with new siding and to repair damage caused by the defective siding. *See Foster* Settlement ¶ 1.48.[13] This compre-

---

[11]The Wausau Settlement is found at J.A. 1792-1802.

[12]The *Foster* Settlement is found at J.A. 1803-2036.

[13]The term "Replacement Cost" is defined in the *Foster* Settlement as

the average cost per square foot of surface area of Siding . . . as agreed upon by the Parties with reference to current R.S. Means Co. data, including all materials, labor and incidental costs as required to remove, replace and repair Siding panels or boards that have sustained Damage . . . with new Siding and to repaint and otherwise restore the exterior of the Property to the extent reasonably necessary to make the repair cosmetically acceptable.

*Foster* Settlement ¶ 1.48.

hensive "Replacement Cost" is then multiplied by a second number called "Compensable Damage" (the square footage of damaged siding on a settlement class member's home) to ascertain the appropriate damage payment. *See id.* ¶¶ 1.16, 1.19.[14]

b.

At the time of the *Foster* Settlement, National Union had long believed that a settlement of the underlying actions would exhaust ABT's underlying insurance coverage and trigger National Union's defense and indemnity obligations under the 1997 NU Policy. Indeed, Aimee Tersy, the Director of Excess Casualty Claims for AIG Technical Services (National Union's claims administrator), who was in charge of ABT's claims against National Union during the *Foster* Settlement negotiations, testified at trial that "never paying was never a consideration. We knew there were damages out there." J.A. 486.[15]

National Union was also aware throughout the *Foster* Settlement negotiations of ABT's efforts to resolve the underlying actions using a single, comprehensive class settlement, an approach that promised to save ABT and its insurers a substantial amount of money. Ms. Tersy testified that she had attended a number of meetings on the proposed *Foster* Settlement, and that National Union understood ABT's settlement strategy. According to her evidence, National Union recognized that the underlying actions must be settled, knew the form the settlement likely would take, and knew that ABT needed the participation of all its insurers in order for the settlement to succeed. After the *Foster* Settlement was entered into and approved by the Alabama court, however, and even though ABT's other insurers agreed to par-

---

[14]The damage award formula used to determine the appropriate payment is set forth in the *Foster* Settlement as follows: "A = [(CD)x(RC)]-D, where A is the Damage Payment, CD is the amount of Compensable Damage, RC is the Replacement Cost, and D is the applicable Deductions." *Foster* Settlement ¶ 1.19(a).

[15]Of note, AIG Vice President Gregnoli testified at trial that "it was obvious to me that the umbrella was going to be impacted by these hardboard siding claims," that National Union was "going to pay substantially," and that it would have to pay "a significant amount of money into defending these type of claims." J.A. 887-89.

ticipate therein, National Union ignored ABT's requests for defense and indemnification under the 1997 NU Policy.

On November 17, 1999, ABT, seeking to resolve its dispute with National Union, made a settlement offer to National Union in the sum of $3 million, believing at the time that the 1997 NU Policy had expired on January 31, 1998. When ABT thereafter realized that the 1997 NU Policy was actually in effect until January 31, 2000, it made a revised settlement offer to National Union, on December 30, 1999, in the sum of $5 million. This proposal would have resolved National Union's defense and indemnity obligations to ABT in connection with the underlying actions.

During the course of these events, National Union's coverage counsel, Christopher Aries, advised National Union that a refusal to contribute to the *Foster* Settlement would be "leaving its insured to 'twist in the wind' and accordingly a Court would not give serious consideration to [an] attempt to claim that the settlement amount was unreasonable." J.A. 2042. Despite this explicit warning (made in confidence by Aries) that it could be exposing itself to claims of bad faith conduct against its insured, National Union did not respond to ABT's settlement proposals, failed to contribute to ABT's defense costs, and did not indemnify ABT against the underlying actions. Rather, National Union delayed resolution of ABT's claims by repeatedly requesting information that ABT had already provided. Finally, on May 24, 2001, nearly seventeen months after ABT's revised offer to settle with National Union for $5 million, National Union simply closed its file on ABT's defense and indemnity claims relating to the underlying actions — without making a decision on its coverage obligations to ABT.

### C.

On June 22, 2004, at the close of ABT's case-in-chief, National Union unsuccessfully moved the trial court for judgment as a matter of law, pursuant to Rule 50(a), on each of ABT's claims. Subsequently, on June 24, 2004, after all the evidence had been presented, National Union renewed its motion for judgment as a matter of law, and the court again denied the motion. On June 25, 2004, at the con-

clusion of the nine-day trial, the jury rendered its Verdict in the matter, finding as follows:

- That National Union had breached its duty to defend ABT in the underlying actions;

- That ABT was damaged by this breach in the sum of $2.5 million;

- That all of the damages alleged in the underlying actions resulted from a single "Occurrence," i.e., alleged defects in the ABT-manufactured hardboard siding;

- That the 1997 NU Policy covered the *Foster* Settlement claims arising from "Property Damage" caused by defective siding installed during the period from January 1, 1997, through January 31, 2000;

- That 22.5% of each *Foster* Settlement payment represents the costs of replacement siding, and 77.5% of each such payment represents the costs of all other labor and materials;

- That National Union is responsible for administrative costs of $378.06 for each future claim made under the *Foster* Settlement;

- That National Union owed ABT $1,860,740 in settlement class counsel fees, notice costs, and claims administration fees already incurred;

- That National Union (in connection with the UDTPA Claim) had failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement with ABT when National Union's liability to pay for part of the *Foster* Settlement became reasonably clear;

- That National Union (also in connection with the UDTPA Claim) had misrepresented the terms of the

1997 NU Policy for the purpose of changing National Union's coverage obligations in 1998-2000, and that ABT had relied on that misrepresentation to its detriment;

- That ABT was damaged, in the sum of $3.9 million, by National Union's conduct relating to the UDTPA Claim;

- That National Union's conduct constituted bad faith, resulting in damages to ABT of $3.9 million; and

- That National Union's bad faith conduct was accompanied by aggravated conduct (such as malice, fraud, or oppression) that indicated a reckless indifference to the consequences thereof, and that ABT was entitled to recover $7.5 million in punitive damages.

*See* Verdict.[16]

On July 16, 2004, ABT filed a motion for judgment on the jury verdict, along with a proposed judgment and a memorandum in support thereof (the "ABT Judgment Memorandum"). On September 30, 2004, after National Union had submitted its opposition to the motion for judgment and ABT had filed a reply, the district court entered its Judgment against National Union.[17] The Judgment entitled ABT to recover from National Union $2.5 million on the Failure to Defend Claim, $11.7 million on the UDTPA Claim (trebled from the jury's award of $3.9 million), and certain interest.[18] The Judgment also

---

[16]The jury found in favor of ABT on all the questions submitted to it except one: "Did National Union fail to make a reasonable investigation of the damages claimed in the homeowner lawsuits against ABT[ ] or the coverage provided for those claims under the National Union policy?" Verdict pt. B.1.b. On this inquiry, the jury's answer was "No." *Id.*

[17]The district court initially entered its Judgment on September 22, 2004, and, *sua sponte*, entered an Amended Judgment on September 30, 2004, correcting certain clerical errors. Our references to the "Judgment" are to the Amended Judgment, found at J.A. 2056-66.

[18]ABT was required by North Carolina law to make a choice between its recovery on the UDTPA Claim and the Verdict's awards on the Bad

included declaratory relief provisions against National Union on the Indemnification Claim (the "Declaratory Provisions"), as follows:

- That ABT is entitled to indemnification from National Union for claims under the *Foster* Settlement that are attributable to installations of defective siding during the period from January 1, 1997, through January 31, 2000;

- That National Union's obligation to indemnify ABT for future claims under the *Foster* Settlement will begin after ABT has paid $3 million in settlement costs or claims attributable to installations from January 1, 1997, through January 31, 2000;

- That, as of the date of the Verdict, ABT had paid *Foster* Settlement costs of $1,860,740 and claims of $275,598 (exclusive of the costs of siding);

- That National Union is obligated to indemnify ABT for 77.5% of each claim under the *Foster* Settlement that is attributable to installations of defective siding during the National Union coverage period; and

- That National Union is obligated to ABT for $378.06 for each applicable claim under the *Foster* Settlement, to cover the administrative costs of handling such claims.

*See* Judgment 6.

Of note, the Declaratory Provisions, consistent with ABT's proposed judgment, did not require National Union to indemnify ABT

---

Faith and Punitive Damages Claims. *See Ellis v. N. Star Co.*, 388 S.E.2d 127, 132 (N.C. 1990). In exercising this choice, ABT decided to accept the treble damage award of $11.7 million under the UDTPA, instead of the $3.9 million award on the Bad Faith Claim and the $7.5 million award on the Punitive Damages Claim. The Judgment provides, however, that if the UDTPA Claim award is overturned on appeal, ABT may elect to recover its awards on the Bad Faith and Punitive Damages Claims, and may move to amend the Judgment to reflect that election.

for its first $3 million in *Foster* Settlement payments (the "$3 million declaration"). *See* Judgment 6. The ABT Judgment Memorandum explained ABT's position on this point as follows: The $3 million figure was the sum of ABT's three successive underlying indemnity coverage limits during the 1997 NU Policy period. The 1997 Wausau Policy had a limit of $1 million per occurrence, which applied to that Policy's coverage period of January 1, 1997, through January 31, 1998. The 1997 Wausau Policy also provided that, if it continued in effect beyond January 31, 1998, it would have a separate $1 million per occurrence limit for each succeeding twelve-month period. Wausau cancelled ABT's coverage for hardboard siding losses in 1998, but because of the 1997 NU Policy's Underlying Insurance Clause, National Union's defense and indemnity coverage obligations are measured as if ABT's hardboard siding coverage under the 1997 Wausau Policy continued throughout the 1997 NU Policy period. That is, a second $1 million limit applies for the period from January 31, 1998, through January 31, 1999, and a third $1 million limit for the period from January 31, 1999, through January 31, 2000. For purposes of the administrative implementation of the Judgment, ABT acknowledged that the aggregate of its underlying indemnity coverage during the 1997 NU Policy coverage period was thus $3 million.[19] As a result, ABT proposed that National Union reimburse it only for the excess over $3 million of ABT's *Foster* Settlement costs for the

---

[19]In its brief on appeal, ABT explains that it proposed the $3 million declaration in an effort to simplify the administration of the Declaratory Provisions, and that its proposal actually benefitted National Union:

> The three-year *indemnity* total was proposed by [ABT] (and adopted by the Court without objection by National Union) to simplify the declaratory judgment payment schedule, even though this arrangement delays the start of the payments to [ABT]. Technically, year-by-year *indemnity* calculations should be used, with National Union required to start its 1997 policy-year indemnity payments as soon as *Foster* claims for siding installed during that year top $1 million, and then to start and pay its 1998 and later indemnity contributions after a separate calculation is made for each subsequent year. To facilitate the administration of these indemnity payments, the [Judgment] aggregates the three separate $1 million underlying limits.

Appellees' Br. 39.

period of the 1997 NU Policy. The Judgment reflects this concession by ABT. *See* Judgment 6.

On October 6, 2004, National Union, in its post-trial motions, renewed its motion for judgment as a matter of law (pursuant to Rule 50(b)), and made separate motions for a new trial and to alter or amend the Judgment. The district court denied those motions by its Order of May 31, 2005 (the "First Order").[20] Importantly, the court there ruled that National Union's duty to defend was triggered by ABT's exhaustion of the annual $1 million underlying limit in effect during the National Union coverage period (the "$1 million trigger ruling"). *See* First Order 7. In so ruling, the court rejected National Union's position that the court had, by its earlier $3 million declaration, already decided that the 1997 NU Policy assigned National Union no defense obligations until ABT had exhausted all three of its successive annual $1 million underlying limits. By another Order entered October 6, 2004, the court exercised its discretion under the UDTPA to award attorneys' fees to ABT in the full amount of its $1,997,161 request (the "Second Order").[21]

National Union has appealed the adverse Judgment entered by the district court, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo a district court's denial of a Rule 50 motion for judgment as a matter of law. *Bryant v. Aiken Reg'l Med. Ctrs. Inc.* 333 F.3d 536, 543 (4th Cir. 2003). Pursuant to Rule 50, the issue for assessment on appeal is whether there was a legally sufficient evidentiary basis for a reasonable jury, viewing the evidence in the light most favorable to the prevailing party, to find for that party. Fed. R. Civ. P. 50(a); *Bryant*, 333 F.3d at 543. If reasonable minds could differ about the verdict, we are obliged to affirm. *Bryant*, 333 F.3d at 543. As with other legal rulings, we review de novo the conclusions of law on which a trial court's denial of judgment as a matter of law

---

[20]The First Order is found at J.A. 2249-64.

[21]The Second Order is found at J.A. 2265-71.

is premised. *See Benner v. Nationwide Mut. Ins. Co.*, 93 F.3d 1228, 1233 (4th Cir. 1996). And we are obliged to accord substantial deference to a district court's interpretation of its own judgment. *See Home Port Rentals, Inc. v. Ruben*, 957 F.2d 126, 131 (4th Cir. 1992).

We review de novo a trial court's legal determinations with respect to a UDTPA claim. *S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese*, 284 F.3d 518, 535 (4th Cir. 2002). We review a jury's factual findings on a UDTPA claim "in the light most favorable to the prevailing party, and '[i]f, with that evidence, a reasonable jury could return a verdict in favor of plaintiffs, [we] must defer to the judgment of the jury, even if [our] judgment on the evidence differs.'" *Id.* (quoting *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1991)).

Finally, we review for abuse of discretion a district court's award of attorneys' fees under the UDTPA. *See* N.C. Gen. Stat. § 75-16.1 ("[T]he presiding judge may, in his discretion, allow a reasonable attorney fee to the duly licensed attorney representing the prevailing party, such attorney fee to be taxed as a part of the court costs and payable by the losing party . . . ."); *see also Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 108 n.6 (4th Cir. 1991); *Blankenship v. Town & Country Ford, Inc.*, 622 S.E.2d 638, 643 (N.C. Ct. App. 2005).

### III.

In its appeal, National Union makes four basic contentions of error. First, National Union contends that the district court erred in failing to grant judgment as a matter of law on the Failure to Defend Claim. Second, National Union maintains that the court erred in failing to grant judgment as a matter of law on the Indemnification Claim. Third, National Union contends that the court erred in failing to grant judgment as a matter of law on the UDTPA Claim. And fourth, National Union asserts that the court erred in awarding attorneys' fees to ABT.

### A.

We first assess National Union's contention that the district court erred in failing to grant its Rule 50(b) motion for judgment as a matter

of law on the Failure to Defend Claim. National Union offers two independent bases for its position in this respect. First, it maintains that the district court erred, in its First Order, in making the $1 million trigger ruling. Second, it asserts that the Wausau Settlement Payment, which exhausted the 1997 Wausau Policy, was not a "payment of claims" within the meaning of the 1997 NU Policy, and thus triggered no duty to defend on the part of National Union. We address these assertions in turn.

1.

We first address National Union's assertion that the district court erred in making its $1 million trigger ruling. National Union maintains that this ruling is inconsistent with the court's $3 million declaration and therefore erroneous.[22] Although the $3 million declaration expressly relates only to National Union's indemnification duty, it also constitutes, according to National Union, a ruling that ABT could claim no coverage (for indemnity *or* defense) under the 1997 NU Policy unless it exhausted all three of its successive $1 million annual underlying limits. As such, National Union contends, the $3 million declaration establishes that the $1.5 million Wausau Settlement Payment — exhausting only the first of ABT's $1 million underlying limits — was legally insufficient to trigger National Union's duty to defend. And if National Union's duty to defend never arose, it could not have been breached. On that basis, National Union assigns as error the court's denial of its Rule 50(b) motion on the Failure to Defend Claim.[23]

---

[22]The $3 million declaration provides that "National Union's obligation to *indemnify* [ABT] for future *Foster* settlement claims shall begin after [ABT] has paid *Foster* settlement costs or . . . claims attributable to installations during the National Union coverage period equal to the $3,000,000 in underlying insurance coverage." Judgment 6 (emphasis added).

[23]National Union also suggests that ABT had a total of $4 million in underlying coverage during the 1997 NU Policy's coverage period, contending that the 1998 Wausau Stub Policy was subject to its own $1 million limit. That position, however, ignores the Underlying Insurance Clause, which provides that National Union's coverage obligations are measured as if ABT's underlying coverage had remained in full force

National Union's only authority for its position on the $3 million declaration is the Declaratory Provisions themselves; National Union regards its reading thereof as self-evident. When National Union presented this position in its post-judgment Rule 50(b) motion, however, the district court rejected it.[24] The court explained that National Union had simply over-read the $3 million declaration, which "refers to indemnity payments and not to National Union's defense obligation." First Order 7. The court specified that "ABT needed to exhaust [only] $1,000,000.00 in underlying coverage before National Union's *duty to defend* was triggered." *Id.* (emphasis added).[25] National Union is thus rowing against a strong current on this point, because "[w]hen a district court's decision is based on an interpretation of its own order, our review" must be highly deferential. *JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc.*, 359 F.3d 699, 705 (4th Cir. 2004) (observing that

---

and effect throughout the coverage period of the 1997 NU Policy, regardless of whether ABT in fact maintained such coverage. *See* 1997 NU Policy § VI.I. As noted above, if ABT's underlying coverage for hardboard siding losses had remained in effect, ABT would have had three successive $1 million annual limits, the second of which subsumes the period during which the 1998 Wausau Stub Policy was effective. Because of the Underlying Insurance Clause, those three $1 million annual limits are the only ones pertinent to the calculation of National Union's coverage obligations.

[24]Until this appeal, National Union consistently maintained that the 1997 NU Policy, although effective for thirty-seven months and never cancelled, covered only the thirteen-month period from January 1, 1997, through January 31, 1998. The jury determined otherwise, however, *see* Verdict pts. B.1.a, E.2, and that finding is not challenged on appeal. National Union's present contention that the 1997 NU Policy requires the exhaustion of underlying limits for both 1998 and 1999 thus could be deemed an expedient afterthought.

[25]The district court's ruling that the 1997 NU Policy required ABT to exhaust only $1 million in underlying coverage to trigger National Union's defense obligations is consistent with the view of National Union's own officials. For example, Ms. Tersy, the Director of Excess Casualty Claims for National Union's claims administrator, acknowledged in her trial testimony that she "knew that the Wausau policy that was underneath the National Union policy was only for a million dollars." J.A. 506.

"district courts are in the best position to interpret their own orders"); *see also Home Port Rentals, Inc. v. Ruben*, 957 F.2d 126, 131 (4th Cir. 1992) ("It is peculiarly within the province of the district court . . . to determine the meaning of its own order."); *Anderson v. Stephens*, 875 F.2d 76, 80 n.8 (4th Cir. 1989) ("We are, of course, mindful of the inherent deference due a district court when it construes its own order."). National Union has failed to explain how a position premised solely on its reading of the Judgment can, in the face of such a deferential standard of appellate review, survive the district court's disavowal of that very position. In effect, National Union has now asked us to take the extraordinary step of rejecting the district court's interpretation of its own Declaratory Provisions. Absent any reasoned basis for so doing, we must decline National Union's invitation.[26]

2.

National Union next contends that the $1.5 million Wausau Settlement Payment does not constitute a "payment of claims" within the meaning of the 1997 NU Policy, which requires the exhaustion of ABT's underlying coverage by "payment of claims" in order to trigger National Union's duty to defend. 1997 NU Policy § II.A.1. Put succinctly, National Union's position is that the term "payment of claims" should be narrowly construed, excluding all payments other than those made directly to third-party claimants against ABT to satisfy judgments or secure the release of claims. By the Wausau Settle-

---

[26]Even if the district court had required ABT to exhaust all three of its successive annual $1 million underlying limits before it was entitled to a defense under the 1997 NU Policy, we would not be bound by such a ruling. We review a trial court's conclusions of law de novo, and, under North Carolina law, we would inquire into whether its interpretation of the Policy was consistent with the parties' intent. *See Register v. White*, 599 S.E.2d 549, 553 (N.C. 2004). National Union does not maintain that the parties actually intended the Policy to operate in the manner now urged, and for apparent good reason, since the parties could not plausibly have intended an excess insurance policy that would provide ABT no coverage until its third year, at the earliest, and none at all unless ABT happened to incur more than $1 million in covered losses in each of its three annual underlying coverage periods. And such a position is rendered even more implausible by the events surrounding National Union's issuance of the 1998 NU Policy. *See supra* Part I.B.2; *infra* Part III.C.

ment, Wausau did not make direct payments to third-party claimants, nor did the Settlement satisfy a judgment or secure the release of any claims against ABT. Rather, Wausau paid ABT in order for ABT to make future payments to third-party claimants, pursuant to the *Foster* Settlement, to resolve the underlying actions. In National Union's view, Wausau's settlement with ABT therefore was not a "payment of claims" under the 1997 NU Policy.

In North Carolina, the interpretation of an insurance policy provision is a question of law. *See Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 172 S.E.2d 518, 522 (N.C. 1970). We thus review de novo the district court's rejection of National Union's proposed interpretation of the term "payment of claims," applying North Carolina's well-established standards for interpreting insurance policy provisions. Under North Carolina law, the primary goal in interpreting an insurance policy is to discern the intent of the parties at the time the policy was issued. *Register v. White*, 599 S.E.2d 549, 553 (N.C. 2004). If the terms of the policy are plain, unambiguous, and susceptible of only one reasonable interpretation, a court will enforce the contract according to its terms. *Id.* If, however, the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations, the doubts must be resolved against the insurer and in favor of the policyholder. *Id.*

Under the foregoing principles, the question that we must decide is whether the term "payment of claims," as used in the 1997 NU Policy, clearly fails to exclude the payment of a claim made by an insured in anticipation of the insured's own subsequent payments to third-party claimants, or, in the alternative, whether the term "payment of claims" is ambiguous on whether it excludes such payments. If either of those conditions is met, we are obliged to reject National Union's proposed interpretation of "payment of claims." Because the term "payment of claims" clearly does not exclude payments of the kind involved here, we are unable to accept National Union's proffered interpretation.

As used in the 1997 NU Policy, the term "payment of claims" is a broad one, which does not restrict the recipient or timing of the payment in question. National Union, of course, could have sought a more restrictive formulation — such as "payment of claims to third

parties" or "payment of judgments or settlement agreements enforce-able by third parties" — but it did not do so. In this case, the Wausau Settlement Payment resolved a claim presented by ABT, Wausau's insured, in anticipation of ABT's own impending payment of claims made by plaintiffs in the underlying actions. Nothing in the term "payment of claims" indicates that National Union and ABT intended it to exclude such payments. And we are neither inclined nor empow-ered to rewrite the 1997 NU Policy to reflect terms that National Union now wishes it had obtained from ABT.

Notably, in sponsoring this narrow construction of "payment of claims," National Union seeks to diminish its substantive obligations under the 1997 NU Policy by taking advantage of the form of the *Foster* Settlement. If ABT had settled the underlying actions individu-ally, by making lump-sum payments to third-party claimants, National Union's defense obligations to ABT would have been trig-gered as soon as Wausau's payments to claimants with defective sid-ing installed in 1997 reached $1 million. ABT instead pursued a single, comprehensive settlement of all the underlying actions. That approach promised to minimize the costs incurred by ABT and its insurers, including National Union, but also meant that the underlying actions would all be settled at once, so that no underlying insurance payments would be made to third-party claimants until the litigation was concluded and ABT no longer required a defense. Therefore, under National Union's view that it had no defense duty until ABT's underlying insurance had been exhausted by payment of claims to third parties, ABT's choice to pursue a comprehensive settlement excused National Union from its contractual obligation to defend ABT.

Put more broadly, National Union, under its view of the term "pay-ment of claims," likely would never be called upon to defend an insured in a situation such as ABT's, where its insured has opted to resolve multiple actions in a single settlement of all outstanding claims, thus obviating the need for any further defense. Even more striking, National Union's view would mean that it could never be required to defend an insured faced with only a single lawsuit, no matter how large, since the insured's underlying insurance would make no payments to the third-party plaintiff (or plaintiffs) until the lawsuit had been resolved and the need for a defense had passed.

National Union's position effectively would assign it a defense duty that would arise in only one circumstance: when its insured has faced multiple actions, resolved enough of them to exhaust its underlying coverage, and continued to defend the rest.

In these circumstances, we reject the view that the parties to the 1997 NU Policy intended the simple term "payment of claims" to effect such a dramatic narrowing of National Union's contractual obligations to defend ABT. *Cf. W & J Rives, Inc. v. Kemper Ins. Group*, 374 S.E.2d 430, 434 (N.C. Ct. App. 1988) (rejecting excess insurer's contention that its duty to defend arose only if primary insurance was exhausted through payment of judgment or settlement, because "then the duty to defend under this contract would arise only after [the insured's] need for defense was past"). Because the Wausau Settlement Payment constituted a "payment of claims" under the 1997 NU Policy, the district court did not err in rejecting National Union's motion for judgment as a matter of law in this regard.[27]

---

[27]In addition to its narrow view of the term "payment of claims," National Union seeks to rely on *Brown v. Lumbermens Mutual Casualty Co.*, 390 S.E.2d 150 (N.C. 1990), to avoid its defense duty. The *Brown* court, in interpreting an ambiguous defense clause in an automobile insurance policy, concluded that the insurer's duty to defend persisted until the lawsuit against its insured culminated in a settlement or judgment, even if the insurer had already paid its policy limits. National Union contends that, under *Brown*, Wausau's duty to defend ABT was never extinguished and National Union's duty to defend thus never arose. That reasoning is flawed, however, since two insurers can possess concurrent defense duties to a common insured, *see* 22 Appleman on Insurance § 136.10 (2d ed. 2003), and National Union's duty to defend would have arisen upon the exhaustion of the 1997 Wausau Policy even if Wausau's defense duty continued thereafter. Moreover, the court in *Brown* reached its result by interpreting an ambiguous policy provision against the issuing insurer, as North Carolina law requires. *See Brown*, 390 S.E.2d at 154. The insurance provision in dispute here is not ambiguous, and, even if it were, *Brown* would support the district court's interpretation of the 1997 NU Policy, not that of National Union.

B.

National Union's second appellate contention is that the district court erred in failing to rule, in connection with the Indemnification Claim, that payments made by ABT pursuant to the *Foster* Settlement were not for "Property Damage" caused by an "Occurrence," and that such payments thus fall outside the scope of the 1997 NU Policy. Pursuant to the Declaratory Provisions, National Union is obligated to indemnify ABT for 77.5% of the *Foster* Settlement payments. In support of its contention on the Indemnification Claim, National Union makes two separate assertions. First, it maintains that payments under the *Foster* Settlement to class members are only for the costs of replacing the defective siding itself, and therefore, are not for "Property Damage" covered by the 1997 NU Policy. Second, National Union contends that the costs of replacing the defective siding, along with the consequential damages suffered by homes upon which the siding was affixed, are readily foreseeable results of ABT's "shoddy workmanship," and thus not caused by an "Occurrence" under the 1997 NU Policy. We assess in turn these two aspects of National Union's contention on the Indemnification Claim.

1.

First, because the *Foster* Settlement provides for the computation of damage awards on the basis of what it terms the "Replacement Cost" of the defective siding, National Union contends that ABT is not covered for payments it makes under the *Foster* Settlement. Pursuant to the *Foster* Settlement, the term "Replacement Cost" includes the costs of all materials, labor, and incidentals necessary to remove defective siding, replace it with non-defective siding, and repair damage to the structure and walls of settlement class members' homes. *See Foster* Settlement ¶ 1.48. This "Replacement Cost," calculated under the formula established by the *Foster* Settlement, is then multiplied by a second number called "Compensable Damage" (the square footage of defective siding on a settlement class member's home) to reach the appropriate damage payment. *See id.* ¶¶ 1.16, 1.19.

For purposes of the Indemnification Claim, the term "Replacement Cost" as used in the *Foster* Settlement — and as treated by the district court, the jury, and ABT at trial — consists of two separate categories

of costs. The first such category represents the costs of materials used to replace the defective siding itself (the "costs of replacement product"), and the second represents all other costs, including labor and materials, arising from the repair work on the damaged homes (the "the third-party property damages"). The third-party property damages category thus consists of consequential damages, including all costs of home repairs except those represented by the costs of replacement product.

We agree with National Union that the first category of costs, the costs of replacement product, does not constitute "Property Damage" under the 1997 NU Policy. As the Policy spells out, "Property Damage" is "[p]hysical injury to tangible property, including all resulting loss of use of that property . . . or [l]oss of use of tangible property that is not physically injured." 1997 NU Policy § IV.K. Importantly, the Your Product Exclusion of the 1997 NU Policy provides that "[t]his insurance does not apply to . . . Property Damage to Your Product arising out of it or any part of it." *Id.* § V.F. Under North Carolina law, this language "excludes damages sought for the cost of repairing or replacing the insured's own work or product." *W. World Ins. Co. v. Carrington*, 369 S.E.2d 128, 130 (N.C. Ct. App. 1988). Thus, the Your Product Exclusion excludes the costs of replacement product from coverage under the 1997 NU Policy.

Our conclusion on the foregoing point is not a subject of controversy in this appeal. The district court acknowledged that, by virtue of the Your Product Exclusion, National Union is not required to indemnify ABT for the costs of replacement product. ABT presented evidence that allocated payments under the *Foster* Settlement between the 22.5%, representing the costs of replacement product, and the 77.5%, representing the third-party property damages. Based on the jury's finding that the costs of replacement product make up only 22.5% of the *Foster* Settlement payments and that the third-party property damages account for 77.5%, the Declaratory Provisions obligate National Union to indemnify ABT for 77.5% of each settled claim attributable to siding installed on homes during the National Union coverage period.

In challenging the Declaratory Provisions, National Union contends that, notwithstanding the jury finding to the contrary, the "Re-

placement Cost" component of the *Foster* Settlement formula is made up entirely of the costs of replacement product (excluded from coverage by the Your Product Exclusion), and does not include the third-party property damages (covered under the 1997 NU Policy as "Property Damage"). In other words, National Union asserts that the jury should have found that the costs of replacement product account for 100% — not just 22.5% — of the *Foster* Settlement payments.

Unfortunately for National Union, its position fails to account for the separate categories of damages encompassed by the term "Replacement Cost" (the costs of replacement product *and* the third-party property damages), and it is not supported by the record. ABT presented evidence at trial on how both categories of the *Foster* Settlement's "Replacement Cost" were calculated. Phillip Waier, a professional engineer retained as a neutral advisor in connection with the *Foster* Settlement, prepared estimates for the costs of removal and replacement of the defective siding. According to Waier, the "Replacement Cost" component of the damage award formula includes not only the costs of replacement siding, but also the labor, materials, and incidentals related to those repairs. Waier also testified that, based on sales data provided by ABT, 22.5% of the "Replacement Cost" represents the costs of replacement product, while the other 77.5% represents the third-party property damages. The jury found Waier's evidence compelling and allocated 22.5% of the "Replacement Cost" to the costs of replacement product, and the remaining 77.5% of the "Replacement Cost" to the third-party property damages.[28]

---

[28]On the "Property Damage" aspect of the evidence and issues presented to the jury, the district court relied on the Your Product Exclusion and the definitions in the 1997 NU Policy to frame its jury instructions. First, the court instructed the jury on the significance of the Your Product Exclusion:

> National Union argues that the "your product" exclusion in the policy operates to exclude a percentage of ABT's costs under the Foster settlement . . . . The policy states that, "This insurance does not apply for the property damage to your product arising out of it or any part of it."

J.A. 1368. The Court then instructed the jury on the 1997 NU Policy's definitions of "Property Damage" and "Your Product":

The district court conducted a post-trial independent review of these findings, and it concluded that they were "reasonable [and] supported by ample evidence." First Order 13. The court thus concluded that National Union is obligated to indemnify ABT for the 77.5% of the "Replacement Cost" that the jury allocated to the third-party property damages, as such damages satisfy the definition of "Property Damage" under the 1997 NU Policy and North Carolina law. Because the evidence supports the jury's findings, and because the court applied the appropriate legal principles in making its challenged ruling, it did not err on the "Property Damage" aspect of the Indemnification Claim.[29]

---

"Property damage" means . . . physical injury to tangible property . . . . "Your product" is defined as . . . any goods or products other than real property manufactured, sold, handled, distributed or disposed of by you . . . .

*Id.* at 1368-69. Finally, the court instructed the jury on its task in applying the contract terms to the evidence:

You will be asked whether [the] your product exclusion in the National Union policy operates to exclude a percentage of ABT's costs under the Foster settlement. If you find that a percentage is excluded, you will need to determine what percentage of the underlying liability is excluded and that which relates to third-party property damage. If it applies, the "your product" exclusion excludes coverage only for the actual costs of the replacement siding itself. [The] "[y]our product" exclusion does not apply to the cost of removing the defective siding and installing and painting the new siding. Moreover, the "your product" exclusion does not apply to the cost of any other work on the home, including the repair or replacement of any other component of the wall system or house.

*Id.* at 1369-70. Of note, National Union does not claim any appellate error on the jury instructions.

[29]National Union makes a related contention that the *Foster* Settlement's means of distributing the settlement funds precludes any conclusion that such payments are in part for covered third-party property damages. A judicial assessment of post-settlement coverage disputes generally turns on the types of underlying claims that have been settled, and not necessarily on the agreed-upon mode of distributing settlement

2.

The second prong of National Union's contention on the Indemnification Claim is that the damages claimed in the underlying actions did not arise from an "Occurrence" within the meaning of the 1997 NU Policy. Pursuant to the Policy, an "Occurrence" is "an accident, including continuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage neither expected nor intended from the standpoint of the Insured." 1997 NU Policy § IV.H. Although the Policy does not define the term "accident," North Carolina law deems an accident to be "an unforeseen event, occurring without the will or design of the person whose mere act causes it; an unexpected, unusual, or undesigned occurrence; the effect of an unknown cause, or, the cause being known, an unprecedented consequence of it; a casualty." *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 340 S.E.2d 374, 379 (N.C. 1986) (internal quotation marks omitted). National Union contends that the district court erred in concluding that the damages claimed in the underlying actions resulted from an accident, because the consequences of ABT's activity in manufacturing the defective siding were foreseeable. It asserts that the deterioration of the siding was not an accident under the 1997 NU Policy, but was instead the expected result of ABT's "shoddy workmanship."

In support of its contention that the *Foster* claims did not arise from an "Occurrence" within the meaning of the 1997 NU Policy, National Union relies on a 1999 North Carolina decision involving a construction contractor seeking insurance coverage for its faulty workmanship. *See Wm. C. Vick Constr. Co. v. Pa. Nat'l Mut. Cas. Ins. Co.*, 52 F. Supp. 2d 569 (E.D.N.C. 1999). The court there held that poor workmanship does not, in and of itself, constitute a covered "occurrence." *See id.* at 585. As ABT points out, however, the *Vick*

---

funds. *See* Allan D. Windt, *Insurance Claims & Disputes* 6.31 (4th ed. Supp. 2006) (noting "the existence of coverage should depend on what claims were settled; that is, it should depend on why the money was paid"). Here, the evidence sufficiently demonstrated that the *Foster* Settlement was intended to compensate the class members' claims for the third-party property damages.

decision has no applicability here, as it was not ABT's workmanship that resulted in the damages complained of — indeed, ABT never performed any work on the *Foster* Settlement class members' homes — it was instead ABT's defective siding that resulted in the third-party property damages.[30]

Moreover, the Supreme Court of North Carolina has rejected the view that an act of negligence, like ABT's manufacture of defective siding, cannot constitute an "accident" under a liability policy when the resulting damage takes place without the insured's actual foresight or expectation. *See Iowa Mut. Ins. Co. v. Fred M. Simmons, Inc.*, 128 S.E.2d 19, 25-26 (N.C. 1962). In *Simmons*, a declaratory judgment proceeding, the insurer contended that it had no duty to defend a suit against its insured, a roofing contractor, for damages caused by rainwater that had leaked into a building through a tarp thrown over an open roof, because rain was not unusual or unexpected. *Id.* The court concluded that the term "accident" in the liability policy did not necessarily exclude the contractor's negligent conduct in leaving the roof insufficiently covered. *See id.* at 25. In so ruling, the court explained that "[t]o adopt the narrow view that the term 'accident' in liability policies of insurance . . . necessarily excludes negligence would mean that in most, if not all, cases the insurer would be free of coverage and the policy would be rendered meaningless." *Id.* In a post-*Simmons* decision, the North Carolina Court of Appeals observed that courts must look to "whether the damage was expected or intended" in determining whether an event constitutes an "occurrence." *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 340 S.E.2d 374, 380 (N.C. 1986). The court emphasized that "[w]hether events are 'accidental' and constitute an 'occurrence' depends on whether they were expected or intended *from the point of view of the insured*." *Id.* (emphasis added). In other words, the issue is not whether an insured should have fore-

---

[30]Even if the *Vick* decision were applicable here, it does not support National Union's position that the *Foster* claims did not arise from an "Occurrence." *See* 52 F. Supp. 2d at 584-86. In *Vick*, the court recognized that, although the construction company's improper application of a waterproofing system was not an "accident," if Vick had been sued for damages to furniture in the building caused by the improperly applied system, "such an event may very well [have been] an 'accident' triggering coverage." *Id.* at 586.

seen the consequences of its conduct, but whether it in fact foresaw or intended the resulting damages. *See id.*

Although National Union has not specifically addressed the *Simmons* decision, it remains good law in North Carolina. *See N.C. Farm Bureau Mut. Ins. Co. v. Stox*, 412 S.E.2d 318, 325 (N.C. 1992) (holding, in light of *Simmons*, that when term "accident" is not defined in policy, even injuries caused by intentional acts can be accidental if injury was unintentional or not substantially certain to result from intentional act). In these circumstances, there is no evidence that ABT expected or intended the homes of the settlement class members to suffer damages from the defective siding. Accordingly, we must sustain the jury's finding that the damages suffered by the class members' homes were the result of an accident, and thus constituted an "Occurrence" under the 1997 NU Policy.[31] We therefore reject National Union's contention that the court erred on the Indemnification Claim in failing to rule that payments made to settlement class members were not for property damage caused by an "Occurrence."

## C.

In its third contention of error, National Union maintains that the district court erred in failing to award judgment as a matter of law on ABT's claim that National Union had violated the UDTPA. *See* N.C. Gen. Stat. §§ 75-1.1 to -39. The UDTPA Claim arises from two separate aspects of National Union's conduct: (1) its handling of the

---

[31]The trial court's instruction on the "Occurrence" issue, in pertinent part, was as follows:

> You must determine whether the property damage was expected or intended from the standpoint of ABT . . . . An act is expected or intended only if the resulting injury, as well the act, were intentional. In other words, to carry its burden of proof, National Union must prove on this issue not only that ABT . . . intended to sell siding for homes but that ABT . . . intended to damage the homes of its customers. Under North Carolina law an act will be considered expected or intended where the policyholder's motivation was to cause property damage or when the policyholder expects that its acts will cause property damage.

J.A. 1370.

claims against ABT in connection with the underlying lawsuits and the *Foster* Settlement; and (2) its misrepresentations to ABT about the 1997 NU Policy's coverage period in order to favorably alter its coverage obligations in the two-year period from January 1998 to January 2000. ABT contends that National Union acted in contravention of the UDTPA in its handling of ABT's claim for indemnification by failing to settle its dispute with ABT. ABT asserts that National Union so acted even though it possessed all the information needed for a coverage determination and actually recognized internally that it had a duty to indemnify ABT for the underlying claims.

Put succinctly, the trial evidence was that ABT provided National Union with Dr. Sullivan's report that consequential damages, i.e., the third-party property damages from the defective siding, would likely be $87.7 million if the case went to trial, and that National Union knew that ABT's primary insurance coverage had been exhausted. National Union officials testified that they recognized, as early as 1998, that the 1997 NU Policy would be implicated in the defective siding claims, and they were warned by National Union's own attorney that a failure to respond to ABT's settlement demands could jeopardize the *Foster* Settlement and expose National Union to claims of bad faith. National Union nevertheless made no effort to respond to ABT's settlement demands, and it closed its ABT file without ever responding. After National Union recognized that the 1997 NU Policy would be implicated, it induced ABT to purchase the 1998 NU Policy, at double the premium ABT was already obliged to pay, for the purpose of limiting National Union's liability for the claims lodged against ABT, even though ABT was already covered by the 1997 NU Policy. Based on this evidence, the jury found that National Union had failed "to attempt in good faith to effectuate a prompt, fair and equitable settlement with [ABT] when National Union's liability to pay for a part of the *Foster* claims became reasonably clear." Verdict pt. B.1.c. The jury also found that National Union had induced ABT to negotiate and buy the 1998 NU Policy on terms less favorable to ABT than those of the 1997 NU Policy, and that ABT relied upon this misrepresentation to its detriment. *Id.* pt. B.1.a.

On appeal, National Union mounts a two-pronged attack on the Judgment entered on the UDTPA Claim. First, it contends that its liability never became reasonably clear, and thus its duty to attempt to

effectuate a prompt, fair, and equitable settlement with ABT never arose. Second, National Union asserts that ABT could not, as a legal matter, have detrimentally relied on its misrepresentation that the 1997 NU Policy was for a term of only thirteen months.

1.

Before assessing these appellate contentions, it is important to briefly review the UDTPA and the applicable legal principles governing the UDTPA claim. In order to recover under the UDTPA, a party is obliged to show the following: "(1) that the defendant engaged in conduct that was in or affecting commerce, (2) that the conduct was unfair or 'had the capacity or tendency to deceive,' and (3) 'that the plaintiff suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation.'" *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 902 (4th Cir. 1996) (quoting *Pearce v. Am. Defender Life Ins. Co.*, 343 S.E.2d 174, 180 (N.C. 1986)). We have recognized that, under North Carolina law, the conduct sufficient to constitute an unfair or deceptive trade practice "is a somewhat nebulous concept," and depends on the circumstances of the particular case. *Id.* One thing is clear, however: "[O]nly practices that involve '[s]ome type of egregious or aggravating circumstances' are sufficient to violate the U[D]TPA." *S. Atl. Ltd. P'ship of Tenn. v. Riese*, 284 F.3d 518, 535 (4th Cir. 2001) (quoting *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001)). Generally, a trade practice will only be deemed "unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981).

Of importance to a judicial assessment of whether a North Carolina insurer's conduct was unfair or had the capacity or tendency to deceive is North Carolina's Insurance Unfair Trade Practices Act (the "IUTPA"). *See* N.C. Gen. Stat. §§ 58-63-1 to -70. As relevant here, the IUTPA, which applies only to the insurance industry, precludes an insurer from, among other conduct, "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." *Id.* § 58-63-15(11)(f). The IUTPA also bars an insurer from "[m]aking . . . any . . . statement misrepresenting the terms of any policy issued or to be issued . . . for

the purpose of inducing or tending to induce such policyholder to lapse, forfeit, or surrender his insurance." *Id.* § 58-63-15(1). Significantly, the Supreme Court of North Carolina has authorized trial courts to look to the IUTPA for examples of conduct that constitute unfair or deceptive acts or practices under the UDTPA. *See Gray v. N.C. Ins. Underwriting Ass'n*, 529 S.E.2d 676, 681-83 (N.C. 2000). In North Carolina, a violation of section 58-63-15(11)(f) of the IUTPA constitutes an unfair or deceptive trade practice under the UDTPA — as a matter of law — because such conduct is "inherently unfair, unscrupulous, immoral, and injurious to consumers." *Id.* at 683. Of importance, the Supreme Court of North Carolina has held that a violation of section 58-63-15(1) of the IUTPA also constitutes a violation of the UDTPA. *See Jefferson-Pilot Life Ins. Co. v. Spencer*, 442 S.E.2d 316, 318 (N.C. 1994).

Under the UDTPA, the "occurrence of the alleged conduct, damages, and proximate cause are fact questions for the jury." *S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese*, 284 F.3d 518, 534 (4th Cir. 2002) (internal quotation marks omitted). On the other hand, "whether [such] conduct was unfair or deceptive is a legal issue for the court." *Id.* Thus, when a jury has found a defendant to have committed infringing conduct, the trial court must then itself determine, as a legal matter, whether such conduct constituted an unfair or deceptive trade practice. *Id.*

Sections 58-63-15(11)(f) and -15(1) of the IUTPA are each implicated here, as the jury found that National Union had engaged in two specific acts forming the basis of the UDTPA Claim: (1) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement with ABT when its liability to pay under the 1997 NU Policy became reasonably clear; and (2) misrepresenting to ABT the terms of the 1997 NU Policy in order to favorably alter its coverage obligations for the two-year period from January 1998 to January 2000. Importantly, the district court concluded post-trial that there was "ample and compelling support in the record" for the jury's finding that National Union had, by virtue of its violations of sections 58-63-11(f) and -15(1) of the IUTPA, violated the UDTPA. First Order 9. On appeal, National Union attacks the jury's findings in this regard, as well as the court's conclusions, maintaining that the jury's findings are "clearly erroneous," and seeking reversal on the UDTPA Claim.

2.

National Union first challenges the jury's finding, and the district court's corresponding ruling, that National Union failed "to attempt in good faith to effectuate a prompt, fair and equitable settlement with [ABT] when National Union's liability to pay for a part of the *Foster* claims became reasonably clear," in contravention of section 58-63-15(f) of the IUTPA. Verdict pt. B.1.c. In support of this contention, National Union maintains that it never possessed a duty to indemnify ABT under the 1997 NU Policy, and thus was never obliged to attempt to effectuate a prompt, fair, and equitable settlement.

In pursuing this contention of error, National Union maintains that the district court's post-trial ruling — that ABT was required to pay $3 million in claims under the *Foster* Settlement before National Union had a duty to indemnify ABT for additional payments under the Settlement — established that National Union's duty to indemnify was never triggered, and National Union's liability to ABT was thus never "reasonably clear." *See* Judgment 6. In support of its contention that it could not have violated section 58-63-15(11)(f) of the IUTPA because its duty to indemnify was never triggered, National Union points to various court decisions supporting the proposition that a UDTPA claim cannot succeed if the claimed losses are excluded from coverage. *See, e.g.*, *Rogers v. Unitrim Auto & Home Ins. Co.*, 388 F. Supp. 2d 638, 643 (W.D.N.C. 2005) (recognizing that when plaintiffs' loss fell outside scope of coverage, plaintiffs could not succeed on UDTPA claim). The decisions on which National Union relies, however, involve situations readily distinguishable from the circumstances here. In this case, the district court did not conclude that the defective siding claims against ABT were excluded from coverage under the 1997 NU Policy. To the contrary, it ruled that the third-party property damages were covered by the Policy, and that National Union is obliged to indemnify ABT upon exhaustion of the underlying primary coverage limits.

We are thus faced with a somewhat unique situation, where it has been established that the insurer has a duty to indemnify that has not actually been triggered, but inevitably will be. Although National Union recognized early in the *Foster* Settlement negotiations that its duty to indemnify ABT would arise, it contends that its liability to

ABT was never reasonably clear and that it had no duty under the IUTPA to seek to settle with its insured. In making this point, National Union urges us to equate reasonably clear liability with the triggering of an insurer's duty to indemnify. Under the 1997 NU Policy, National Union agreed that it "will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law." 1997 NU Policy § I. Thus, National Union relies on the proposition that its duty to indemnify ABT under the 1997 NU Policy arises when two events occur: (1) the underlying limits are exhausted; and (2) ABT becomes legally obligated to pay. If we were to accept National Union's contention on this point — that it has no duty to attempt to effectuate a good faith settlement until its insured is legally obligated by a final judgment or settlement agreement — we would substantially undermine section 58-63-15(11)(f) of the IUTPA, which does not require a final judgment before an insurer has a duty to attempt to effectuate a settlement.

The issue for us to assess, therefore, is not whether National Union had a present duty to indemnify, but whether its "liability [had become] reasonably clear" under the IUTPA. N.C. Gen. Stat. § 58-63-15(11)(f). National Union contends, in support of its decision not to settle with ABT, that ABT's $5 million settlement demand was premised only on liability projections, and did not rely on any specified sums presently due. The trial evidence, however, which the jury and district court accepted, was that National Union's liability was reasonably clear. Every primary and excess carrier of ABT — other than National Union — settled with ABT after receiving Dr. Sullivan's report indicating that the third-party property damages from the defective siding would likely be about $87.7 million if the case went to trial. Ms. Tersy, the Director of Excess Casualty Claims for National Union's claims administrator, acknowledged at trial that National Union had received Dr. Sullivan's report containing the information that ABT's other insurance carriers had relied on in making their settlement decisions, and she admitted that National Union had learned from Wausau that coverage under the 1997 Wausau Policy had been exhausted. The evidence also established that National Union's officials were convinced (even before receiving Dr. Sullivan's report) that the 1997 NU Policy would be implicated in the defective siding claims. Indeed, Vice President Gregnoli of AIG

(National Union's parent) testified that, as early as 1998, during the underwriting process for the 1998 NU Policy, National Union knew that the 1997 NU Policy was going to be implicated in the defective siding claims. Under the evidence, National Union's realization that it was obliged to provide coverage to ABT pursuant to the 1997 NU Policy was the impetus for its scheme — by misrepresentations and fraudulent conduct — to secure ABT's purchase of the 1998 NU Policy.

Notwithstanding the substantial trial evidence supporting National Union's early recognition that it would be liable to ABT for indemnification on the defective siding claims, National Union failed to account for its utter lack of response to ABT's settlement demands. National Union could have acted reasonably under the circumstances — for example, it could have conducted an independent analysis of what the third-party property damages might be, or it could have advised ABT to wait for the actual costs of the claims in the underlying actions to be ascertained. National Union did neither — nor anything else — it instead simply closed its file on ABT without rendering a coverage decision. Viewed in the proper light, this evidence provides ample support for the jury's finding that National Union's indemnification liability was "reasonably clear" and that National Union nonetheless failed to attempt in good faith to effectuate a settlement with its insured.

In North Carolina, a violation of section 58-63-15(11)(f) of the IUTPA constitutes an unfair or deceptive trade practice under the UDTPA, as a matter of law. *Gray*, 529 S.E.2d at 683. Because the evidence supports the jury's finding that National Union engaged in conduct violating section 58-63-15(11)(f) of the IUTPA, and because such a violation is "inherently unfair" and a violation of the UDTPA, the district court's ruling that National Union violated the UDTPA was not erroneous.[32]

---

[32]In a related contention, National Union maintains that, even if its liability to ABT was reasonably clear, ABT was unable to establish the aggravating circumstances required to support the UDTPA Claim. This assertion is also without merit. It is true, of course, that a bad faith refusal to settle a claim cannot rest merely "on honest disagreement or

3.

By its Verdict, the jury also found that National Union had violated the UDTPA by misrepresenting to ABT the terms of the 1997 NU Policy. More specifically, the jury found that National Union induced ABT to negotiate and buy the 1998 NU Policy on terms less favorable to ABT, and that ABT relied upon this misrepresentation to its detriment. Verdict pt. B.1.a. Such conduct contravened the IUTPA provision prohibiting insurers from "[m]aking . . . any . . . statement misrepresenting the terms of any policy issued or to be issued . . . for the purpose of inducing or tending to induce such policyholder to lapse, forfeit, or surrender his insurance." N.C. Gen. Stat. § 58-63-15(1).

On appeal, National Union does not dispute the jury's finding that it misrepresented to ABT the coverage period of the 1997 NU Policy. Nor does National Union dispute that the purpose of this misrepresentation was to induce ABT to purchase another policy at twice the premium for a period during which ABT was already covered, and to limit National Union's liability for the defective siding claims. Instead, National Union asserts that, as a matter of law, ABT could not have detrimentally relied upon National Union's misrepresentation, because ABT had already obtained Endorsement #012, clarifying that the actual coverage period for the 1997 NU Policy was thirty-seven months. National Union therefore contends that ABT cannot establish National Union's misrepresentation caused its injury.

As we have observed, under North Carolina law "what constitutes proximate cause between a deceptive act and a plaintiff's damages remains ambiguous." *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 903 (4th Cir. 1996). To be sure, however, proxi-

---

innocent mistake." *Dailey v. Integon Gen. Ins. Corp.*, 331 S.E.2d 148, 155 (N.C. Ct. App. 1985); *see also Olive v. Great Am. Ins. Co.*, 333 S.E.2d 41, 46 (N.C. Ct. App. 1985). Under the evidence here, however, the district court was justified in ruling that National Union's failure to settle was more than "honest disagreement or innocent mistake," and was instead a violation of section 58-63-15(11)(f) and "inherently unfair" under North Carolina law.

mate cause may be established by evidence of reliance, and here, the evidence readily supports a finding of reliance by ABT. *See id.*

First, the Rovelli Email, corroborated by Rovelli's testimony, demonstrated that he knew, before underwriting the 1998 NU Policy, that the 1997 NU Policy extended coverage to ABT through January 31, 2000, and that there was no policy provision permitting National Union to cancel its coverage early. Nonetheless, National Union misrepresented to ABT that it had to buy the 1998 NU Policy, and ABT in fact purchased the Policy, paying double its annual premium for less coverage. It is nonsensical that ABT would have contemplated the purchase of another insurance policy, doubling its premium and narrowing its coverage, if it had known that it already had coverage under the 1997 NU Policy. And the jury found against National Union on this point, concluding that ABT relied on National Union's misrepresentation that ABT had to purchase the 1998 NU Policy, and would not have done so in the absence of National Union's misrepresentation. *See* Verdict pt. B.1.a. The involvement of ABT in procuring Endorsement #012 thirteen months earlier did not excuse National Union's misrepresentation of coverage to ABT. National Union is not entitled to successfully assert, when ABT did as National Union requested, that ABT could not rely on National Union's misrepresentation because it already knew of the falsehood. This is precisely the kind of conduct the IUTPA aims to deter. We thus agree with the district court that the evidence before the jury provided "ample and compelling support" for a finding of detrimental reliance. First Order 9.

Of course, an insurer has no duty under North Carolina law, in the absence of a request, to keep its insured apprised of the meaning and effect of all the provisions in its policy. *See, e.g.*, *Hardin v. Liverpool & London & Globe Ins. Co.*, 127 S.E. 353, 355 (N.C. 1925) ("We cannot approve the position that, in the absence of a request, it was the agent's legal duty to explain the meaning and effect of all the provisions in the policy."). The circumstances here, however, are not that ABT had unvoiced misconceptions about the meaning of the provisions of the 1997 NU Policy that it expected National Union to first intuit, and then clarify for ABT. Instead, the evidence is that National Union engaged in a scheme to provide unsolicited, false information to ABT, for the specific purpose of inducing ABT to purchase insurance for a period for which National Union was already providing

coverage to ABT, in order to minimize National Union's liability for the defective siding claims.

As we have emphasized, the Supreme Court of North Carolina has decided that a violation of section 58-63-15(1) of the IUTPA constitutes a violation of the UDTPA. *See Jefferson-Pilot Life Ins. Co. v. Spencer*, 442 S.E.2d 316, 318 (N.C. 1994). The trial evidence supported the jury's finding that National Union engaged in conduct constituting a violation of section 58-63-15(1), and that ABT relied on National Union's misrepresentations to its detriment. Verdict pt. B.1.a. Because a violation of this provision of the IUTPA is a violation of the UDTPA, the district court did not err in concluding that National Union contravened the UDTPA when it misrepresented the terms of the 1997 NU Policy to induce ABT to purchase the 1998 NU Policy. National Union's challenge to the Judgment on the UDTPA Claim must therefore be rejected.

### D.

Finally, National Union challenges the district court's award of attorneys' fees to ABT under the UDTPA. *See* Second Order. Under North Carolina law, a court is entitled to award attorneys' fees against the losing party in a suit alleging a violation of the UDTPA. *See* N.C. Gen. Stat. § 75-16.1. A court can do so upon finding willfulness on the part of the party committing the violation, plus an unwarranted refusal to resolve the matter which forms the basis of the suit. *See id.* Thus, in order to award attorneys' fees to ABT, the district court was obliged to find the following: (1) that National Union had violated the UDTPA; (2) that it did so willfully, and engaged in an unwarranted refusal to fully resolve the matter forming the basis of the suit; and (3) that the attorneys' fees being sought were reasonable. *See id.*

National Union premises its challenge to the attorneys' fees award on its contention that the district court erroneously concluded that it had violated the UDTPA, and thus had no statutory authority to make an award of fees under the UDTPA. To the contrary, however, the jury's findings and the court's conclusions were amply supported by the evidence and the law. *See supra* Part III.C. In these circumstances,

we are unable to say that the court abused its discretion in making an award of attorneys' fees.[33]

### IV.

Pursuant to the foregoing, the Judgment of the district court is affirmed.

*AFFIRMED*

---

[33]In awarding attorneys' fees, the court found that National Union had willfully contravened the UDTPA and engaged in an unwarranted refusal to fully resolve its dispute with ABT. The court also determined that the costs and fees sought by ABT were reasonable, and it spelled out its factual findings pursuant to North Carolina law. *See United Labs., Inc. v. Kuykendall*, 437 S.E.2d 374, 381-82 (N.C. 1993). More specifically, the court observed that the litigation against National Union involved complex issues requiring significant legal work, including a nine-day jury trial. The court found ABT's counsel to be skilled and competent, and it found their hourly rates to be "reasonable, customary and comparable" for the representation involved. Second Order 3, 5. Finally, the court noted that ABT had obtained an "extraordinarily high degree of success," a factor that weighed strongly in favor of making the attorneys' fees award. *Id.* at 6.

NIEMEYER, Circuit Judge, dissenting:

ABT Building Products Corp. and its subsidiary, ABTco, Inc., a manufacturer of hardboard siding, (collectively "ABT"), commenced this action against National Union Fire Insurance Company ("National Union"), for breach of an umbrella policy issued by National Union to ABT for the period January 1, 1997, through January 31, 2000. ABT claimed that National Union failed to provide a defense to it for numerous underlying actions and to indemnify it for amounts that it agreed to pay in a global settlement of those actions. The underlying actions involved allegations that defective hardboard siding produced by ABT caused damage to homes in which the product was installed during a period of over 20 years. As an excess insurer, National Union declined to defend the underlying actions or to participate in the global settlement because, it contended, ABT had not exhausted the limits of its primary insurance policies either before or after the global settlement. In its complaint, ABT alleged breach of contract and unfair trade practices under North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq.*, in support of its request for a declaratory judgment, damages, punitive damages, treble damages, and attorneys fees.

The jury returned a verdict in favor of ABT, and based on the verdict, the district court entered judgment in favor of ABT for an amount in excess of $14 million plus attorneys fees of just under $2 million. The majority now affirms that judgment by essentially rewriting National Union's umbrella policy and ignoring the preconditions to any duty of National Union under the umbrella policy. The record in this case *conclusively* shows that:

> (1)  During the relevant period when National Union was ABT's excess insurer, ABT had obtained three consecutive primary insurance policies from Employers Insurance of Wausau ("Wausau") providing coverage for the payment of damage claims up to $1 million for each occurrence and supplemental payments for attorneys fees and costs, for a total amount of coverage during the period of at least, as conceded by the parties, $2 million, plus a $1 million self-insured retention, and attorneys fees and costs.

(2)    By its terms, National Union's umbrella policy did not provide coverage to ABT until ABT had "exhausted" its primary insurance from Wausau "*by payment of claims*" made against ABT.

(3)    As of the date of the verdict in this case, June 25, 2004 (over four years *after* National Union's policy expired), ABT and its primary insurance carriers had paid out on 469 homeowners' claims attributable to the relevant period the following amounts:

   (a)    $275,598 in damages, paid to the claimants;

   (b)    $80,012 in the costs of the replacement hardboard siding itself, paid to the claimants;

   (c)    $1,448,709 in attorneys fees;

   (d)    $234,719 in class action notice costs;

   (e)    $177,312 in administrative costs.

There is absolutely no evidence in the record *of any more monies* paid by ABT or its primary insurer in respect of homeowners' claims made for occurrences during the relevant period of National Union's policy, a fact that the jury confirmed in its verdict form.

Under no reasonable calculation do these numbers demonstrate that the payments made, even as late as 2004, had exhausted the primary coverage provided by Wausau to ABT, and even at this time, the preconditions for National Union's coverage under its umbrella policy have not been demonstrated. Indeed, the data indicate that ABT may never have to pay claims that exhaust its primary Wausau policies for the period January 1, 1997, through January 31, 2000, the period of coverage afforded by National Union's umbrella policy. As of 2004, the payment of damage claims covered by the primary insurance totaled just under $276,000, less than one-tenth of the underlying limits.

As will be shown herein, the majority rewrites National Union's policy to require it to participate in defense and settlement discussions on the slim possibility that *claims in the future* could exhaust the primary limits of Wausau's insurance coverage. But in doing so, the majority has done violence to the policy language; directly assaulted the longstanding expectations of the insurance industry in issuing excess policies; and erected a new, indecipherable standard for future conduct by excess insurers. I roundly dissent.

I

A

In 1992, ABT acquired the building products division of Abitibi-Price Corporation, which had manufactured and sold hardboard siding in North Carolina since 1970 for use on the exterior of mobile and stand-alone homes to protect against the elements. Beginning in 1995, numerous individual and class-action lawsuits were filed against ABT by homeowners who had purchased and installed hardboard siding manufactured by ABT and its predecessor Abitibi, claiming that "when exposed to moisture, humidity, and other normal climatic conditions, [the hardboard siding] absorbed moisture and prematurely rotted, buckled, swelled, cracked, or otherwise deteriorated." They alleged that they had suffered damage to their homes when the siding was installed, beginning in 1974, and that the damage would continue as long as the ABT siding "remained affixed."

ABT and the homeowner claimants entered into negotiations, beginning in 1997, and agreed to settle all of the claims through a lead class action entitled *Foster v. ABTco. Inc.*, No. CV-95-151-M (Ala. Cir. Ct.), which had been filed in 1995. The settlement was reached and approved by the Alabama circuit court in September 2000 (the "*Foster* Settlement"). Under its terms, all persons who had ABT's hardboard siding installed during the 25-year period from May 15, 1975, through May 15, 2000, released their court claims against ABT in exchange for the ability to present a limited claim for a specified sum and other benefits under a claims program established in the *Foster* Settlement. The settlement itself created a "siding repair program" that included the right of eligible class members also to file claims for a payment by ABT of an amount specified by a "Compensation For-

mula." In addition, the settlement established a new 25-year "Enhanced Warranty," which included procedures for reviewing and compensating future claims. Finally, the settlement required ABT to pay the homeowners' attorneys their fees and the costs of the class actions.

Before executing the *Foster* Settlement, ABT sought coverage for the homeowners' claims from at least four insurers other than National Union: Firemens' Fund Insurance Company for the period October 20, 1992, to October 20, 1993; Standard Fire Insurance Company for the period October 20, 1993, to October 20, 1994; Farmington Casualty Company for the period from October 20, 1994, to January 1, 1997; and Wausau for the period January 1, 1997, to January 31, 1999.

Wausau's policies provided the insurance that underlay National Union's umbrella policy. Wausau issued a policy to ABT for the 13-month period from January 1, 1997, to January 31, 1998 (the "1997 Wausau Policy"), which did not exclude claims for defective hardboard siding. In January 1998, however, Wausau gave ABT a notice of cancellation of the 1997 Wausau Policy, indicating that in the future Wausau would exclude coverage for hardboard siding. To comply with a 90-day notice requirement for policy cancellation, Wausau issued a "stub policy" (the "1998 Wausau Stub Policy"), providing ABT coverage for the three-month period from January 31, 1998, to May 1, 1998, under the same terms as were contained in the 1997 Wausau Policy. When the 1998 Wausau Stub Policy ended, Wausau issued a new policy to ABT, providing coverage from May 1, 1998, to January 31, 1999 (the "1998 Wausau Policy"), which excluded coverage for hardboard siding claims.

Wausau's three policies included the same general terms and conditions for the three separate periods covered. Each provided that Wausau would "pay for damages" up to $1 million for each occurrence during the policy period or $2 million in the aggregate, plus "supplementary payments" representing the costs and expenses that Wausau incurred in investigating, defending, and settling claims. The Wausau policies provided coverage limits under the following terms:

> The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remain-

ing period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

Wausau initially refused to defend ABT in the *Foster* litigation, and both sides filed declaratory judgment actions to determine their rights with respect to the homeowners' claims. In November 1999, Wausau and ABT executed a settlement agreement, in which ABT agreed to release Wausau from its obligations under the three policies for the homeowners' lawsuits in exchange for Wausau's single payment to ABT of $1.5 million. There is no suggestion that at the time of settlement, any homeowners' claims had been paid or settled. The parties, however, allocated the settlement amount to the 1997 Wausau Policy and the 1998 Wausau Stub Policy, both of which covered hardboard siding claims, assigning, through some undisclosed allocation formula, $1,147,058.83 to the 1997 Wausau Policy and $352,941.17 to the 1998 Wausau Stub Policy. Under the settlement, Wausau also agreed that its obligation to participate in defending the homeowners' lawsuits extended only through July 31, 1999.

While negotiating its settlement with Wausau and possible settlements with other insurers, ABT also demanded that National Union provide a defense and indemnification in the *Foster* litigation under its umbrella policy issued in 1997. That policy provided excess coverage during a 13-month period from January 1, 1997, to January 31, 1998, with limits of $25 million per occurrence and $25 million in the aggregate. It provided coverage for the payment of damages for "injury [to third parties] that takes place during the policy period and is caused by an Occurrence." When ABT received the umbrella policy from National Union, it realized that the coverage period was incorrect, and accordingly it added an endorsement to extend its coverage from January 1, 1997, to January 31, 2000.

In late 1997, underwriters at National Union decided to issue a new policy to ABT, notwithstanding the endorsement that had already extended coverage of ABT's existing policy to January 31, 2000. National Union sent notice to ABT, misstating that its existing policy

would expire on January 31, 1998, the expiration date of the original 1997 policy. Thereafter, National Union issued and ABT purchased a subsequent commercial umbrella policy to cover the period from January 31, 1998, to January 31, 2000. This policy increased the limits to $50 million per occurrence and $50 million in the aggregate, and it also increased the premium. Because of the existence of the endorsement in the 1997 policy, however, the parties agree that in this litigation only the amended 1997 National Union umbrella policy is controlling for purposes of reviewing coverage liability. Thus, references to National Union's policy are to the umbrella policy that it issued on January 1, 1997, and amended by endorsement to extend to January 31, 2000.

Under the terms of its umbrella policy, National Union agreed to cover only "those sums *in excess of the retained limit* that the Insured becomes legally obligated to pay by reason of liability imposed by law . . . because of Bodily Injury, Property Damage, Personal Injury or Advertising Injury that takes place during the Policy Period and is caused by an Occurrence." The policy defines "Retained Limit" as "the total of applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of any other underlying insurance providing coverage to the Insured." The Schedule of Underlying Insurance listed ABT's Wausau policy and its per-occurrence and aggregate limits of $1 million and $2 million, respectively.

The excess policy also provided that if the underlying insurance lapsed, National Union would "only be liable to the same extent" that it would have been if the underlying policy had been maintained and renewed without material change. Thus, in addition to at least three separate $1 million limits of coverage in the Wausau policies, National Union could act as though there was an additional $1 million in underlying coverage by virtue of the lapsed coverage provision for the period January 31, 1999, to January 31, 2000. The parties do not dispute, however, that at least $3 million was available in underlying limits from the primary Wausau policies, and the judgment entered by the district court so provides.

In addition to agreeing to indemnify ABT for "damage claims" exceeding ABT's primary insurance, the umbrella policy imposed on National Union a duty to defend, subject to the following conditions:

[National Union] shall have the . . . duty to defend any claim or suit seeking damages covered by the terms and conditions of this policy when:

> The applicable limits of Insurance of the underlying policies in the Schedule of Underlying Insurance and the Limits of Insurance of any other underlying insurance providing coverage to the Insured *have been exhausted by payment of claims to which this policy applies.*

(Emphasis added).

In a letter dated December 30, 1999, after ABT had settled with Wausau, ABT requested that National Union also enter into a settlement with ABT to dispose of the claims made by homeowners against ABT arising from the *Foster* litigation. Initially, ABT demanded that National Union pay ABT $3 million to pay the claims that would be made under the *Foster* Settlement program. This proposal was based on the mistaken belief that National Union's policy only covered the period from January 1, 1997, to January 1, 1998. When ABT's counsel discovered that National Union also provided coverage for the period 1998 to 2000, ABT increased its demand to $5 million, claiming that the higher amount reflected National Union's "pro-rata exposure" to the claims covered by the *Foster* Settlement program. The projection accompanying the letter predicted $37.8 million in future claims, of which counsel allocated $3.52 million to National Union. The basis for these sums and for the allocation was not disclosed.

In January 2000, National Union's claims handler assigned to the ABT policy, Aimee Tersy, accompanied by Christopher Aries, who was retained by National Union as outside coverage counsel, met with ABT representatives to discuss the situation. Tersy explained that National Union required additional information to determine whether ABT had exhausted its primary insurance coverage through payment of covered claims, as required by the terms of National Union's umbrella policy. Tersy also requested documentation supporting ABT's estimates of consequential damages, as distinct from damages incurred to pay for the replacement hardboard siding itself, because National Union's policy covered consequential damages only.

Shortly after the meeting with ABT, Aries, who was then a junior associate with Lester, Schwab, Katz & Dwyer, LLP, sent a draft letter, dated February 9, 2000 (the "Aries letter"), advising National Union of its legal options with respect to the claims made against ABT. Aries laid out three options for National Union. First, Aries advised National Union that it could settle with ABT by paying out an indeterminate sum, noting that "it is very difficult, it [sic] not impossible, to accurately value the amount of a National Union contribution, this resulting from a combination of factors, most notably the early stage of the underlying class litigations, [and] the 'divide and conquer' strategies used by [ABT] in keeping all its insurers separate." Second, National Union could request further details about the settlement and explain that it "cannot evaluate its exposure on the information currently provided by the insured." Third, National Union could deny coverage based on ABT's failure to exhaust the limits of its primary coverage. Aries predicted that if National Union adopted the second or third options, either "the settlement of the underlying litigation will burst, whether solely on National Union's decision not to participate, or for other reasons" or, alternatively, ABT would file a coverage action against National Union. Aries wrote that, "[i]n the latter scenario, National Union would be at a distinct disadvantage, for the equities involved . . . would look unfavorable upon National Union leaving its insured to 'twist in the wind' and accordingly a Court would not give serious consideration to our attempt to claim that the settlement amount was unreasonable."

After independently assessing the claims against ABT, National Union rejected Aries' advice as legally unsound, and Aries' letter never became the position of National Union. This became obvious not only from National Union's decision not to follow it, but also from the letter itself, which was an incomplete draft, riddled with grammatical and spelling errors. Rather than settle or deny coverage outright, on February 11, 2000, National Union refused ABT's demand for payment, explaining that ABT had not provided the information necessary for National Union to evaluate ABT's demand. Over three months later, on May 24, 2001, when it had received no response to its requests for information and had no new evidence of exhaustion or documentation to support ABT's damages projections, National Union "closed" ABT's file without a coverage determination and with no further notice to ABT.

Despite National Union's refusal to participate in the *Foster* Settlement (and contrary to Aries' prediction in his draft letter), the homeowners' claims were settled in the *Foster* Settlement, which established the compensation program described above and the resulting claims procedure for damaged homeowners.

In June 2004, shortly before the jury below returned its verdicts, ABT prepared a document entitled "Foster Settlement Fees/Costs to Date (corrected June 22, 2004)," which listed all monies paid under the *Foster* Settlement and which was submitted to the jury. That document argued that National Union's share of the *Foster* Settlement costs as of June 2004 was: $1.45 million in attorneys fees; $234,719 in class action notice costs; $177,312 in administrative costs; and $275,598 in "*Foster* claims paid to date." There is no evidence that ABT paid any claims other than those paid under the *Foster* Settlement.

B

In June 2001, ABT filed the five-count complaint in this case, seeking (1) a declaratory judgment that National Union had a duty to defend and indemnify ABT in the *Foster* litigation; (2) damages for breach of contract based on National Union's refusal to defend or indemnify ABT; (3) damages for bad faith denial and handling of claims; (4) punitive damages for National Union's willful and wanton conduct in discharging its contractual and fiduciary duties; and (5) treble damages for unfair and deceptive trade practices that violated N.C. Gen. Stat. § 75-1 *et seq*. In its bad faith and unfair trade practices counts, ABT alleged that National Union "failed to acknowledge and act reasonably promptly on communications with respect to the claims at issue"; "failed to adopt and apply reasonable standards for the prompt investigation of claims asserted against [ABT]"; "failed and refused to provide coverage . . . based on an unreasonable interpretation of the policy"; and "did not attempt to effectuate a prompt, a fair and equitable resolution of the claims."

In its answer, National Union advanced the defenses that it never had a duty to defend or indemnify ABT because (1) ABT had not exhausted the limits of its primary insurance, and (2) the underlying homeowners' claims were not based on "property damage" resulting

from an "occurrence" but rather were primarily based on damage to siding itself, which the policy did not cover.

Following trial, a jury returned a verdict against National Union in the amount of $2.5 million in damages for breach of duty to defend; $3.9 million in damages for unfair trade practices; and $7.5 million in punitive damages. Although the jury found that National Union made a reasonable investigation of the homeowners' claims against ABT, it nevertheless held that National Union "misrepresented the terms of its 1997 policy for the purposes of changing National Union's insurance coverage obligations in 1998-2000" and that ABT detrimentally relied on that misrepresentation; that National Union failed "to attempt in good faith to effectuate a prompt, fair and equitable settlement"; and that National Union's conduct demonstrated "bad faith," accompanied by "aggravated conduct . . . that indicates a reckless indifference to the consequences." This constituted a two-fold finding — that National Union had violated North Carolina's Unfair and Deceptive Trade Practices Act both by misrepresenting the terms of the policy and by refusing, in bad faith to settle. The jury did not break out the damages for those two violations.

The jury found that the hardboard siding claims all flowed from a single "occurrence" under the umbrella policy, and that the per-occurrence limits thus controlled the allocation of loss among insurers.

The jury also found that National Union's share of the *Foster* Settlement costs was $1,448,709 for attorneys fees, $234,719 for class action notice costs, and $177,312 for claims administration fees, totaling $1.86 million. It found that National Union was liable for 77.5% of future claims by homeowners and that 22.5% of such claims represented the cost of replacing hardboard siding. It also concluded that National Union would be liable for $378.06 for administrative costs for each future claim settled. The division of damages for future claims was made in recognition that National Union's policy covered property damage but not replacement costs.

Acting pursuant to North Carolina's Unfair and Deceptive Trade Practice Act, N.C. Gen. Stat. § 75-16, the district court trebled the $3.9 million damages amount returned in the verdict to $11.7 million.

ABT elected to recover the trebled damages, rather than punitive damages, and the court entered judgment against National Union in the amount of $2.5 million for breach of duty to defend and $11.7 million in trebled damages for bad faith claims handling and unfair trade practices.

The district court also issued a declaratory judgment that National Union would be obligated to indemnify ABT for future *Foster* Settlement claims "beginning once ABT has paid *Foster* Settlement costs or claims attributable during the National Union coverage period equal to $3 million in underlying insurance coverage." The court found that as of the date of the verdict, ABT had paid *Foster* Settlement claims of $275,598 (exclusive of the cost of siding) and $1,860,740 in attorneys fees, class action notice costs, and administrative costs falling within National Union's coverage period. The court held that when the "claims attributable to installations during the National Union coverage period equal the $3 million, National Union would then have a duty to indemnify ABT for 77.5% of the future payments, plus $378.06 for administrative cost of each claim."

The district court denied National Union's post-trial motions for judgment as a matter of law, a new trial, and remittitur, and ordered National Union to pay $1,997,161 in ABT's attorneys fees and costs.

From the district court's judgment, totaling more than $16 million and obligating National Union to pay future claims, National Union filed this appeal.

II

Under North Carolina law, which the parties agree is controlling, insurance policies are contracts interpreted according to ordinary principles of contract law. *Gaston County Dyeing Machine Co. v. Northfield Ins. Co.*, 524 S.E.2d 558, 563 (N.C. 2000); *Brown v. Lumbermens Mut. Cas. Co.*, 390 S.E.2d 150, 153 (N.C. 1990); *see also N. C. Ins. Guar. Ass'n v. Century Indem. Co.*, 444 S.E.2d 464, 467 (N.C. App. 1994). Thus, a court has a "duty to construe and enforce insurance policies as written, without rewriting the contract or disregarding the express language used. The duty is a solemn one, for it seeks to preserve the fundamental right of freedom of contract."

*Fidelity Bankers Life Ins. Co. v. Dortch*, 348 S.E.2d 794, 796 (N.C. 1986).

An insurance company's duty to defend is part of its contractual obligation and is defined by the language of the insurance policy. *See Lumbermens Mut.*, 390 S.E.2d at 152. Although the duty to defend is broader than the duty to indemnify, *see Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 340 S.E.2d 374, 377 (N.C. 1986), North Carolina courts have joined numerous other jurisdictions in holding that an excess insurer's duty to defend is triggered only when the limits of primary insurance have been exhausted. *See, e.g.*, *Fieldcrest Cannon v. Fireman's Fund Ins. Co.*, 493 S.E.2d 658, 660 (N.C. Ct. App. 1997) (holding that the insurer was "an umbrella" excess coverage carrier, and as such, its duty to defend could not be triggered unless and until the primary insurers' coverage limits were paid); *see also* Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* 188 (5th ed. 1992) ("The traditional view is that an excess insurer is not required to contribute to the defense of the insured so long as the primary insurer is required to defend").

The language of National Union's umbrella policy in this case provides no different standard, obligating National Union to defend ABT in the homeowners' hardboard claims only after the limits of the underlying insurance had been exhausted. Precisely, the language provides that National Union's duty to defend does not arise until the applicable limits of the underlying Wausau policies "providing coverage to [ABT] *have been exhausted by payment of claims to which this policy applies*." The claims to which National Union's policy applies are claims for damages made against ABT "by reason of liability imposed by law or assumed by contract by [ABT] . . . because of . . . property damage . . . that takes place during the Policy Period and is caused by an Occurrence." As a "liability" policy, the National Union policy insures against claims made *by others* against ABT. This distinguishes a liability policy from a first-party policy, such as a fire or health insurance policy, under which the insured itself is the claimant.

In its umbrella policy, National Union had not only a duty to defend after underlying limits were exhausted, but also a duty to indemnify ABT for payments made in respect to damage claims. Again, National Union's duty to indemnify arises only "for that por-

tion of damages in excess of [ABT's] Retained Limit" which is defined as the greater of either:

1.  The total of the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other underlying insurance providing coverage to the Insured; or

2.  The amount stated in the Declarations as Self-Insured Retention as a result of any one Occurrence not covered by the underlying policies listed in the Schedule of Underlying Insurance nor by any other Underlying Insurance provided coverage to the Insured.

These contractual conditions for National Union's duty to defend and to indemnify have not been demonstrated under any hypothesis or calculation, even today. While *any one* of the Wausau policies provides ABT with $1 million in limits to pay homeowners' damage claims (not including the cost of siding, which is not covered), it is undisputed that only $276,000 has been paid to such claimants. Even if we were to include the costs of siding, $80,012, which is not covered by either National Union or Wausau's policies, only one-third of the underlying limits of *one* policy has been exhausted.

To escape the inevitable conclusion, the majority has ignored the specific language of the umbrella policy and lifted out of context the term "payment of claims," which defines the precondition to coverage, in order to hold that Wausau's $1.5 million payment in settlement of its obligations to ABT exhausted the underlying limits in National Union's policy, even though ABT used at most $276,000 of the money to pay homeowners' claims. Without any analysis of the policy language, the majority declares that the term "payment of claims" includes both Wausau's $1.5 million settlement with ABT and ABT's obligation to pay future claims. It states:

As used in the 1997 NU Policy, the term "payment of claims" is a broad one, which does not restrict the recipient or timing of the payment in question. National Union, of course, could have sought a more restrictive formulation — such as "payment of claims to third parties" or "payment of

judgments or settlement agreements enforceable by third parties" — but it did not do so. In this case, the Wausau Settlement Payment resolved a claim presented by ABT, Wausau's insured, in anticipation of ABT's own impending payment of claims made by plaintiffs in the underlying actions. Nothing in the term "payment of claims" indicates that National Union and ABT intended it to include such payments. And we are neither inclined nor empowered to rewrite the 1997 NU Policy to reflect terms that National Union now wishes it had obtained from ABT.

This ruling is a remarkable reformation of National Union's umbrella policy, a liability insurance policy that insures ABT for its *liability* to third persons. If the majority cared about the policy language, under no stretch of the imagination could it have concluded that Wausau's payment of its settlement with ABT was the "payment of claims *to which this policy applies*." The plain language required that the policy limits be exhausted by payments *to injured parties* in respect of their claims.

The indemnity provision, which is incorporated into the defense provision, provides coverage for "sums . . . that the *Insured becomes legally obligated to pay* . . . because of bodily injury, property damage, personal injury or advertising injury." Naturally, the "claims to which this policy applies" are claims that fit in the categories listed. It is nonsensical to refer to sums paid *to* ABT in this fashion. As a liability policy, the policy clearly contemplates sums paid out *by ABT*, or at least on ABT's behalf, by virtue of ABT's legal obligation to third parties. Notably, the majority does not even quote this provision of the contract.

Moreover, the underlying Wausau policy covered "bodily injury" and "property damage." ABT suffered neither of those injuries, and so the Wausau-ABT settlement payment cannot be painted as a payment of claims to implicate the excess layer of coverage.

A fuller textual analysis, which has been traditional in this court's interpretation of contracts, *see Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 57-58 (4th Cir. 1992) ("Courts are not at liberty to disregard the plain language of a plan in order to demand that the insurers

provide coverage for which no premium has been paid — or ever will be — paid"), and which has not been attempted by the majority in this case, also precludes the majority's conclusions. The general duty-to-defend provision is contained in Part II of the policy entitled "Defense." Section A provides the duty to defend once the underlying insurance has been exhausted by the *payment of claims*, and Sections B and C talk about the *claims* referred to in that Section. Part II(B) provides:

> When we assume the defense of any *claim* or suit:
>
> 1.  We will defend any suit against the insured seeking damages on account of bodily injury, property damage, personal injury or advertising injury even if such suit is groundless, false or fraudulent, but we have the right to investigate, defend and settle the *claim* as we deem expedient.
>
> 2.  We will pay the following, to the extent that they are not included in the underlying policies listed in the schedule of underlying insurance or in any other insurance providing coverage to the insured:
>
>     \*       \*       \*
>
>     b.  premiums on appeal bonds required by law to appeal any *claim* or suit we defend, but we are not obligated to apply for or furnish any such bond;
>
>     c.  all costs taxed against the insured in any *claim* or suit we defend.

Part II(C) refers to "claim" similarly:

> In all other instances except A. above, we will not be obligated to assume charge of the investigation, settlement or defense of any *claim* made, brought or proceeding instituted against the Insured.

These provisions within Part II of the policy employ the word "claim" five different times. In each case, it simply could not be more clear that "claim" is the claim of a third party against the insured and not a claim *by the insured* against its insurance carrier.

ABT and the majority twist this use of "claim" beyond all recognition by using the word "claim" to cover claims *by the insured* against the primary carrier. This simply cannot be squared with the word's use in the rest of the "Part II Defense" provision. Indeed, the majority's reading requires "claim" to have a different meaning in two places on the very same page of the insurance policy. The majority thus converts a traditional *liability* policy insuring the insured against claims made by third parties against the insured into a *first-party* policy in which the insured itself becomes the claimant.

The majority chastises National Union for not specifically restricting the meaning of "payment of claims" to third parties. Well, of course, contracting parties *can* contract their way out of arbitrary judicial interpretations of their language, and in light of today's decision, they apparently must. But the judiciary should, as in all interpretations, attempt to give words that have been employed their fair meaning, rather than yearn for a clarity of language that would eliminate the need for interpretation altogether.

This textual reading of "claims" is bolstered by the terms of the *Foster* Settlement agreement itself. That agreement defines "claim" as "a request for payment for Damage or for reimbursement of an Unreimbursed Repair submitted to the claims office under this Settlement Agreement." A payment of "a claim" simply could not occur prior to the *Foster* Settlement, under the very terms of that agreement. Similarly, the language of the settlement between Wausau and ABT releases "claims, demands, actions, lawsuits or proceedings of every kind and nature . . . *against ABT* . . . arising from the design, manufacture, testing, marketing, warranty, and/or sale by ABT of hardboard siding." The claims being released by that settlement are the very claims allegedly insured by Wausau and by National Union — i.e. the hardboard siding claims made by homeowners.

Nor can the $1.5 million paid by Wausau to ABT in settlement of their disputes be portrayed as an "indirect" payment of claims to third

parties. The third-party homeowners may well have suffered those injuries, and payments to them, if within the coverage of insurance, would be "payments of claims" that would use up underlying insurance limits. But the $1.5 million settlement between Wausau and ABT was not paid to those injured parties; it was paid *to ABT*. Nor did the settlement provide that funds be set aside for the payment of injured party claims. Of course, while ABT would be enriched by the $1.5 million payment and thereby better be able to pay third-party claims as they were made, there is no evidence that the $1.5 million was in fact paid to the injured parties. Indeed, those injured parties were required by the *Foster* Settlement still to prove their claims using the settlement process established a year later. To the date of trial, 469 homeowners made such claims, and ABT has paid only $276,000 for damages in respect to them.

Moreover, Wausau could not exhaust its responsibilities under its primary policies simply by paying ABT for possible future claims that have not been made and might never be made. According to the majority, whether or not a nickel ever goes to actual injured claimants, National Union's coverage is implicated once the primary insurer settles, and National Union is thus saddled with the obligation to pay for any mistakes the primary carrier makes in evaluating future liability. This interpretation runs directly counter to North Carolina law:

> It is true that in each of the above cases the insurer tendered its policy limits into court and awaited determination of liability, . . . while here [the insurer] paid its policy limit directly to the claimant in return for a release of the insurer. This, we believe, is a distinction without material difference. The result under both procedures, vis-à-vis the insured, is the same. *The claim against the insured remains outstanding, because there has been neither a judgment nor settlement disposing of that claim.*

*Brown v. Lumbermens Mut. Cas. Co.*, 390 S.E.2d 150, 155 (N.C. 1990) (emphasis added). Thus, the insurer in that case could not escape its duty to defend until the *underlying claim had been resolved*. Merely tendering its limits to the insured did not cut off its obligation. The primary insurer here, Wausau, similarly could not

escape its duty to defend merely by tendering payment to the insured, and it did not even try to do so. It knew that it had an obligation to defend until its policy limits were exhausted by the payment of *claims to third parties*. For this reason, the underlying limits of insurance could not be exhausted by the Wausau Settlement, and any obligation on the part of National Union had to await exhaustion by payment of claims to third parties.

The fact remains from any fair reading of National Union's umbrella policy that its duty to defend does not arise until ABT has exhausted the underlying limits of $1 million for each policy by the payment of claims to the homeowners in respect to their hardboard claims, and to date that condition has not been satisfied.

## III

Even if ABT had demonstrated that the $1.5 million settlement payment made by Wausau to ABT went to the payment of third-party claims under Wausau's policy, it still would fall far short of demonstrating that National Union's duty to provide excess coverage was triggered. For National Union to have a duty to defend or to indemnify, ABT must demonstrate that the underlying coverage has been exhausted for at least one of the policy periods.

The $1.5 million paid by Wausau to ABT was to discharge Wausau's liability under at least two policies, the 1997 Wausau Policy and the 1998 Wausau Stub Policy. Because the 1997 Wausau Policy covered a period of 13 months, its $1 million per-occurrence limit had to be exhausted twice, once for the first 12 months and once for the 13th month. As the policy itself provides:

> The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

True, Wausau and ABT could have extended the policy period stated in the declarations by amending the date of expiration to May 1, 1998, and thereby limited the application of the quoted provision to two applications of the $1 million occurrence limit. But instead they agreed to the issuance of a second policy, the 1998 Wausau Stub Policy, with a new policy number, new declarations, new premiums, and a policy period covering the period January 31, 1998, through May 1, 1998. That policy also had a $1 million per occurrence coverage limitation. It is noteworthy that both Wausau and ABT treated the 1998 Wausau Stub Policy as a separate policy for purposes of settling their coverage dispute. To exhaust the coverage under the 1997 Wausau Policy, Wausau would have had to pay claims exceeding $2 million, and to exhaust the coverage under the 1998 Stub Policy it would have had to pay claims exceeding $1 million. (This does not even address the 1998 Wausau Policy and National Union's protection under the lapsed coverage provision of its policy).

Thus, if the $1.5 million settlement amount paid by Wausau to ABT represented a payment of claims to third parties, as required by the National Union policy in order to exhaust underlying coverage, the coverage under the 1997 Wausau Policy still would not have been exhausted. A $1.5 million payment of claims does not exhaust $2 million of coverage.

To avoid this, the majority opinion must either ignore the contractual language or rewrite it so that the 1997 Wausau Policy includes only one $1-million limitation for the entire 13 months and an additional $1-million liability for the 1998 Stub Policy, for a total of $2 million. The majority then applies the $1.5 million payment to only one of the policies to demonstrate that the underlying coverage was exhausted. While it is not clear how the majority is avoiding the contractual language, it might alternatively be allocating the $1.5 million payments to the two policies in the same ratio as the settlement of the coverage dispute between Wausau and ABT did — $1,147,058.83 to the 1997 Wausau Policy and $352,941.17 to the 1998 Wausau Stub Policy. Because the $1.1 million amount allocated to the 1997 Wausau Policy was greater than the $1 million coverage, the majority holds that ABT exhausted its underlying coverage, thereby entitling it to a defense and indemnity from the National Union umbrella policy.

The majority states no basis and has no basis, however, to make such an allocation. The settlement agreement making the allocation did not do so based on when injuries were sustained, when occurrences occurred, or when claims were made. Indeed, the agreement settling the coverage dispute between Wausau and ABT states to the contrary:

> Such allocations shall not be an admission that any coverage or defense or indemnity is or is not afforded by any insurance policy to which such allocation is made, nor is it an admission that any "accident," "Occurrence," or "property damage," as those terms are used in any such policies, did or did not take place or potentially during the policy period of any such policy.

Moreover, ABT has never demonstrated, even up to now, the dates of occurrences for purposes of assigning homeowners' claims to particular policies. Yet, that is precisely what it must do in order to exhaust coverage under any given policy. Each Wausau policy undertakes to pay damage claims made against ABT only if the property damage "occurs *during the policy period*," and only those claims can trigger the umbrella coverage.

Finally, the majority cannot even conclude that the allocation of $1.1 million to the 1997 Wausau Policy exhausts the posited $1 million coverage for the payment of claims under that policy. Because the $1 million in coverage was a limitation for only the payment of damage claims to third parties and because the policy provided for "supplemental payments" with respect to defense costs, one would have to conclude that the $1.1 million payment allocable to the 1997 Wausau Policy was for the payment of claims and not defense costs incurred by ABT before it settled with Wausau. Such a conclusion is both illogical and unsupported. It is illogical because the parties would not allocate $1.1 million for claims when the policy only covered $1 million in claims. Moreover, in the context of the facts of this case, it would appear that all of the $1.1 million in fact went to defense costs because at the time Wausau and ABT settled, ABT had not paid one dollar with respect to claims made by homeowners. This is confirmed by the fact that ABT paid all claims of homeowners through the claims procedure established almost a year later in the

*Foster* Settlement. Accordingly, one would have to conclude, contrary to what the majority held, that the $1.1 million allocation made in the settlement agreement between Wausau and ABT did not even exhaust the first dollar of the $1 million limitation for the first 12 months of the 1997 Wausau Policy.

In short, the majority opinion conducts none of the analyses necessary to determine whether underlying coverage had been exhausted. Had it done so, it would necessarily have had to conclude that Wausau's underlying coverage has not been exhausted, even to this date, and therefore that National Union's duty to defend and to indemnify has not yet arisen.

IV

To eliminate any possibility that National Union's duty to defend and indemnify may have been triggered in this case, we make the extreme assumption that the entire $2.1 million in defense costs and payments of claims allocated to National Union by ABT at trial is to be applied to exhaust Wausau's underlying insurance. At trial, ABT summarized all the payments made under the *Foster* Settlement that must be "charged" to National Union, indicating that they represent a pro rata amount based on National Union's policies' coverage of the 37-month period from January 1, 1997, to January 31, 2000. The "charges" included not only amounts paid to homeowner claimants but also for attorneys, costs, and administration, as follows:

| | |
|---|---|
| Attorneys fees | $1,448,709 |
| Class action notice costs | 234,719 |
| Administration of claims costs | 177,312 |
| Payments to claimants | 275,598 |
| Total | $2,136,338 |

To consider this $2.1 million sum as going toward the exhaustion of underlying insurance, we are forced to ignore the policy language contained in the underlying Wausau policies that

1)    The $1 million limit in each policy is exhausted *only* by the *payment of claims*, not the payment of costs and

attorneys fees which are payable *in addition* to the $1 million limit; and

2) each $1 million limit covers the payment of claims only for occurrences *during the policy period.*

As we have already shown, these contractual provisions limit us to consideration of only $276,000 in actual payments to claimants. Those payments, of course, do not exhaust any $1 million limit, regardless of how ABT determines which claims apply to which policies.

Generously, though, we consider the full $2.1 million sum and apply it to Wausau's policies. Because ABT has provided no data about the dates of occurrences for a contractually-required allocation among policies, we must adopt some other method of allocation.

There are two possible methods. One is a pro rata method, whereby the claims are allocated among policy periods to see if the limits in any given period have been exhausted. *See, e.g.*, *Insurance Co. of North Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1224 (6th Cir. 1980). Another is the "all sums" method, where the total limits are compared with total payouts. *See, e.g.*, *Keene Corp. v. Insurance Co. of North Am.*, 667 F.2d 1034, 1047 (D.C. Cir. 1981). If the total payouts are greater than the total aggregated limits, then the policy is exhausted.

In general, the pro rata approach seems to best capture the wishes of ABT and tenor of the majority opinion. Thus, for the purpose of demonstration, we assume that the claims were evenly distributed throughout the policy period. Since the 1997 Wausau Policy period was 13 months long, it is the most likely period during which ABT might have exhausted its limits. A pro rata allocation would thus result in allocating an amount of $750,605.24 in claims, administrative fees, and costs to the 13-month period ($2,136,338 37 x 13). This amount clearly does not exceed the underlying $2 million per-occurrence limits of the Wausau policy or even the $1 million limit urged by ABT. And if ABT's *payments of claims* is the only sum allocated pro rata, ABT paid only $96,831.73 for *Foster* claims arising during the 1997 coverage period. When this correct calculation is per-

formed, ABT has not exhausted even one-tenth of its underlying coverage in any policy period.

Although ABT concedes that its payments for costs and claims are properly allocated by using the pro rata method, its position would not be improved if we were to apply the total-payments aggregative approach. Under this method, ABT's total *Foster* payments, which amount to $2,136,338, are compared to the aggregate of policy limits underlying National Union's 37-month coverage period.

The underlying insurance provided coverage under the 1997 Wausau Policy of $2 million — $1 million for the 12 months from January 1, 1997, to January 1, 1998, and $1 million for the 1 month from January 1, 1998, through January 31, 1998. There was another $1 million of coverage for the 1998 Wausau Stub Policy. And finally there was $1 million self-insured retention from the lapse of siding coverage from the 1998 Wausau Policy, for a total of $4 million.

The parties disagree about whether ABT had $3 million or $4 million in its primary coverage layer 1997 through 2000, but we need not resolve that factual dispute in determining whether ABT exhausted the aggregate value of its primary policies.[1] Even if ABT had only $3 million worth of coverage, it did not make payments of claims — generously interpreted as including costs and fees — exceeding that amount for National Union's 37-month coverage period. And since, on this approach, ABT failed to exhaust $3 million worth of coverage, it never triggered National Union's duty to defend using the "all-sums" method.

The majority states with some astonishment that if payment of claims actually means payment of the claims of injured individuals, National Union "likely would never be called upon to defend an insured in a situation such as ABT's, where its insured has opted to resolve multiple actions in a single settlement of all outstanding claims" or in a situation where there was only one lawsuit, and liability would be assigned at the end of that lawsuit. Far from being an

---

[1]National Union has conceded that in determining whether it had a duty to defend, the difference between the $3 million and $4 million amounts is irrelevant. Reply Br. at 10 n.2.

anomaly in National Union's case, this dynamic is the essence of the excess insurer concept. Indeed, at oral argument, *even counsel for ABT* conceded that if there was one large case, no duty to defend would attach until after the case was over. What is baffling to the majority is that the excess insurer does not need to "get in the game" until after the primary limits are exhausted. Yet, that is ubiquitously understood in the insurance industry and even by the adverse litigants in this case.

The primary insurer has the primary responsibility for defending claims brought against its insured. It has the primary responsibility for investigating those claims. It has the primary responsibility for paying defense costs, and must do so, in some cases, after its policy limits have been exhausted. *Brown*, 390 S.E.2d at 155. The excess insurer's contractual obligation is to pay defense costs and indemnify the insured after the primary insurer's limits have been exhausted. "Over-all, it is the primary insurer's duty to assume all defense costs. A true excess insurer is specifically intended to come into play only when the limits of underlying primary coverage are exhausted." Eric Mills Holmes, *Holmes' Appleman on Insurance* § 145.4[B]. Until that happens, the excess insurer is entitled to stand by, because none of its contractual obligations have been implicated. Once the dust has settled, the excess insurer may of course be required to repay the primary insurer for defense costs incurred on its behalf, just as the primary insurer may sometimes have to pay the insured for defense costs expended. This is not an anomaly, but the appropriate division of labor between different layers of insurance. The primary insurer has the closest relationship with the insured and the best facilities for resolving claims. The excess insurance contract is specifically structured to avoid responsibility for these ground-level considerations, and the excess insurer is entitled to rely on its contract. In many cases, that will mean that the insured or the primary insurer will advance defense costs that are later attributable to the excess insurer, which the excess insurer will of course repay. *See W & J Rives, Inc. v. Kemper Ins. Group*, 374 S.E.2d 430, 434 (N.C. Ct. App. 1988).

Since no one can plausibly argue that the underlying insurance in this case was exhausted, or indeed has been exhausted, the majority's view of the case can only be justified if the duty to defend is much broader than the duty to indemnify. *Waste Mgmt. of Carolinas*, 340

S.E.2d at 377 ("Generally speaking, the insurer's duty to defend the insured is broader than its obligation to pay damages incurred by events covered by a particular policy."). This is the law for *primary* insurers. It is not the law for excess insurers. Primary insurers often have to provide a defense before liability is determined. Thus, the duty to defend and the duty to indemnify cannot be coterminous. Excess insurers, however, have different contractual arrangements and different economic functions. When the excess insurer comes on the scene, liability has already been determined. The role for the excess insurer is much more limited — it has not signed up to be in the trenches with the insured, litigating claims. Rather, it makes payments once those claims have entered its layer of coverage.

> [I]f during settlement negotiations the primary insurer is allowed to force the excess insurer to cover part of the primary's insurance exposure, the coverages and rate structures of the two different types of insurance — primary and excess — would be distorted, and excess insurance premiums would have to be adjusted.

*Valentine v. Aetna Ins. Co.*, 564 F.2d 292, 298 (9th Cir. 1977). In this case, the contract of excess insurance provides that which is standard in the industry — that National Union does not have any duty to defend until the primary insurance is exhausted by the *payment of claims*.

The leading treatise makes clear that excess insurance has a very particular function, which is to provide coverage for extremely rare events at an affordable premium.

> Umbrella policies serve an important function in the industry. In this day of uncommon, but possible, enormous verdicts, they pick up this exceptional hazard at a small premium. Assuming one's automobile . . . policy [has] liability limits of $1000,000 or even $5,000,000, the umbrella policy may pick up at that point and cover for an additional million, five million, or ten million.

8C John Alan Appleman, *Insurance Law and Practice* § 5071.65 (2d ed. 1981). Because excess insurance is so inexpensive, insureds

should not expect the kind of comprehensive defense and indemnity they receive from their primary CGL policies.[2] Though it is outlandish to the majority that the excess insurer need not pick up the defense tab until the primary limits have been exhausted, that is precisely what the parties contracted for and what they should receive.

The majority, by pursuing a textually indefensible reading of the policy, may succeed by its benevolence in helping the policyholder here. But this decision and others like it will spell a tale of woe for policyholders in the long run. When courts do not enforce contractual language as written, the only way for insurers to stay in business is to raise premiums. The ultimate effect is to make unavailable the inexpensive additional coverage given by excess insurers who can count on reliable judicial interpretations of their policies.

Equally troubling, the majority's opinion encourages insured parties to pursue the "divide and conquer strategy" apparently employed by ABT in the instant case. ABT, in the *Foster* litigation, moved all of the siding claims into a private facility for resolution. While negotiating the *Foster* Settlement process, it negotiated settlements with its insurers, a varying mix of primary and excess insurers covering some 25 years of hardboard siding failures. It did not, however, disclose the amounts of settlements to any of its other insurers. In fact, as it told National Union in this case, it would not reveal the terms of any of its settlements.

The goal of using this method is to extract the maximum possible coverage from the insurers. Because ABT claims that its settlement of the coverage dispute with Wausau exhausted the policy limits, it could claim to National Union that National Union had first-dollar payment obligations on all remaining claims, and that its duty to defend kicked in immediately, even though the underlying limits had not been exhausted in any concrete sense. This strategy carries the attendant risk that ABT will be compensated out of all proportion to

---

[2]In this case, ABT paid $72,000 in premiums for the 1997 Wausau Policy, which provided $1 million of coverage for each "Occurrence" and $2 million in the aggregate, whereas it paid only $59,000 in premiums for the National Union Umbrella policy, which provides $25 million of excess coverage for each "Occurrence" and in the aggregate.

its actual losses in the case. Most perniciously, it vastly expands the defense duties of excess insurers, who contracted to act as a backstop if claims exceeded underlying coverage, not to take on the duty to defend as soon as the primary insurer settled a coverage dispute. If the projected claims never emerge in reality, and they may not, then ABT will have realized an incredible windfall of insurance payments without underlying liability.

V

ABT also contends that National Union acted in bad faith and in violation of North Carolina's Unfair and Deceptive Trade Practices Act, which requires an insurer to act "in good faith to effect a prompt, fair and equitable settlement when its liability became reasonably clear," *see* N.C. Gen. Stat. § 58-63-15(11)(f). ABT argues that the jury had sufficient evidence before it to conclude that "[b]y the winter of 1999, National Union's *liability* under its policy was far more than 'reasonably clear,'" and that, rather than settle with ABT, "National Union made a conscious choice, to turn its back on its policyholder and to close its case file in the hopes that ABTco would go away." And the majority now accepts this view without conducting any analysis of National Union's duties under the terms of its policy.

Whether National Union violated the provisions of the Unfair and Deceptive Trade Practices Act on which ABT relies depends entirely on whether its liability to defend ABT was "reasonably clear."[3] Having already concluded that National Union had absolutely no liability to defend ABT in the *Foster* litigation until ABT had affirmatively established exhaustion of underlying insurance through the *payment of claims*, ABT's claim of unfair trade practices with respect to National Union's failure to settle is readily dismissed. Because ABT had not exhausted its underlying policy limits, National Union was

[3]ABT concedes, perhaps unwittingly, that the jury's verdict on the unfair trade practices claim "was based on the fact that National Union failed to attempt in good faith to effectuate a settlement 'when liability to pay for a part of the *Foster* claims became reasonably clear.'" Because the jury's premise — that National Union's liability became "reasonably clear" — was erroneous as a matter of law, its conclusion that National Union engaged in unfair trade practices was equally invalid.

not liable to ABT and could not have violated the Unfair and Deceptive Trade Practices Act by refusing to defend or indemnify ABT.

If it is clear that an insurer had no liability, an action for unfair trade practices cannot go forward. *See Rogers v. Unitrim Auto & Home Ins. Co.*, 388 F. Supp. 2d 638, 643 (W.D.N.C. 2005) (holding that because the insureds' "loss was excluded from coverage . . . their claim for unfair and deceptive trade practices must also necessarily fail"); *Central Carolina Bank Trust Co. v. Sec. Life of Denver Ins. Co.*, 247 F. Supp. 2d 791, 802 (M.D.N.C. 2003) (holding that where liability was not "reasonably clear," insured could not recover on unfair and deceptive trade practices claim).

Since it was reasonably — indeed manifestly — clear that National Union had no obligation to defend or indemnify ABT, National Union did not act unfairly in refusing to settle. On the contrary, in requesting that ABT supply evidence that it had exhausted its underlying coverage through the payment of claims, National Union acted exactly as was required under the terms of its policy.

Because ABT has presented nothing, even now, that suggests that the underlying insurance policies have been exhausted, the majority points to ABT's statistician's report, which suggested that the homeowners' claims arising from injuries over a 25-year period *could reach* up to $87.7 million. This forward-looking report was prepared on the basis of numerous assumptions and did not take into account, indeed could not have taken into account, the slowness and difficulty of the claims-resolution facility created by the *Foster* Settlement, as well as other unforeseeable events. Most egregiously, the majority writes as though $87 million was closely related to the scope of National Union's liability. Yet, National Union provided insurance for only three years, and then only for damages exceeding the $3 or 4 million level of primary insurance. In using the $87-million figure, the majority overlooks the projection sent out by ABT charging National Union with liability for the three years of *at most* $3.52 million. Regardless of which projection is used, however, the point remains that the majority imposes on National Union an immediate obligation to begin settlement talks as soon as it receives such projections, which were nothing more than the naked assertion of *future* lia-

bility by the obviously self-interested insured. The majority thus equates *potential* liability with actual liability.

It is apparently of no moment to the majority that no money had actually been *paid on claims*; that intervening events had drastically reduced the likely liability; or that no proof of claim had ever been presented to the excess insurer. Indeed, at the time the majority says that National Union "should" have started defending, National Union had not even been provided the terms of the Wausau-ABT settlement of their coverage dispute and so could not have been aware of the payments the majority believes triggered its coverage obligation. All of this makes obvious why the insurance industry, including National Union's excess policy, requires exhaustion of underlying insurance by the actual *payment of claims*.

The majority points to the settlements that ABT entered into with other insurers as evidence that settlement talks were appropriate. It does so without one whit of evidence of what the policies of those other insurers said, what information they received, or what claims had been paid that they were responsible for indemnifying. It also ignores the possibility that a wait-and-see attitude is, if not the most polite behavior, contractually justified and legally reasonable.

The majority gives two suggestions for how National Union should have behaved, even if its payment obligation, if any, would only develop years later. First, it suggests that National Union should have conducted an independent analysis of what third-party property damages might be. This suggestion is strange in the insurance world. The filing of a proof of claim, as is required by most insurance contracts, is the duty of the policyholder. To *require* the insurer to conduct an independent investigation turns this burden of proof on its head. The suggestion also ignores the fundamental division of labor between excess and primary insurers. The majority grafts investigation duties onto the contract of the excess insurer, despite uncontested trial evidence that such investigation simply is not what excess insurers do. As Aimee Tersy testified:

> We monitor as an excess carrier. We use the term investiga-
> tion loosely in this respect. As an excess carrier we don't go
> out and investigate claims. We don't go to plants and see

how a product is made necessarily in the beginning because this is something the primary carriers do. They have the responsibility of going out there and doing the leg work, meaning how does this work, what the damages are.

Second, the majority says that National Union "could have advised ABT to wait for the actual costs of the claims in the underlying actions to be ascertained." This rule is a form of Emily Post jurisprudence, imposing a requirement of communication when there is simply nothing to communicate about. National Union told ABT that they "were working on it and asked for more information." It is hornbook law that "because an excess insurer has no [first-dollar] contractual obligation to defend its insured, it logically follows that an excess insurer also has no obligation to issue a reservation of rights letter until its contractual duty is invoked." Eric Mills Holmes, *Holmes' Appleman on Insurance* § 145.2 (2d ed. 1996). National Union simply had no duty to say anything to ABT until the preconditions to its coverage were met. "An excess carrier owes no duty to the insured nor to the primary carrier either to defend the insured or to enter into settlement negotiations." *Certain Underwriters of Lloyd's v. Gen. Accident Ins. Co.*, 699 F. Supp. 732, 740 (S.D. Ind. 1988), *aff'd* 909 F.2d 228 (7th Cir. 1988).

Moreover, the majority is flat wrong that National Union did nothing. Uncontested evidence at trial shows that on June 8, 1998, over a year before ABT's settlement proposal to National Union, National Union sent a letter to ABT which read:

Please be advised that the referenced National Union policy, excess policy, is an umbrella policy. By the terms of such policy, the applicable underlying limits must exhaust before any liability for defense or indemnity may attach. We understand that at the present time underlying coverage has not been exhausted. Therefore, any request for defense or indemnity at this time is premature.

ABT was thus fairly placed on notice that National Union wanted proof of exhaustion. And ABT never contended that National Union was not entitled to exhaustion or that it was National Union's responsibility to determine coverage before exhaustion.

The majority's view insists that the insurer constantly indulge its insured with letters, conversation, and consultation, even when no credible coverage has been invoked. Under ABT's view, it could have asked National Union to do any number of irrelevant tasks, and National Union would have had an obligation to respond. It can cite no authority for this freestanding obligation of social engagement with the insured. In fact, no such obligation is generally understood to exist:

> Excess insurance is routinely written in the insurance industry with the expectation that the primary insurer will conduct all of the investigation, negotiation and defense of claims until its limits are exhausted . . . Thus, the primary insurer acts as a sort of deductible and the excess insurer does not expect to be called upon to assist in these details. The duty of the primary insurer is not divisible or limited to those suits that are within the policy limits and the insuring agreement creates a duty to defend any suit regardless of the amount claimed against the insured and the excess insurer is a third party beneficiary of that agreement.

7C John Alan Appleman *Insurance Law and Practice*, § 4682 (1979).

Underlying the majority's entire opinion is its holding that National Union should have settled the unspecified claims as soon as it received the loss projections from ABT. Surely, this rule should also include a formula for determining "how much?" Embedded in such projections as that given to National Union are a host of factual and legal assumptions, some of great complexity. In this case, the formula would have to include how many houses were damaged? How many people were going to bring claims? How would that vary over time? How did the number of claims depend on the settlement process that was being adopted? How much of the cost of repair could be allocated as property damage? How much underlying coverage was there?

These questions would have to be answered, or at least brought within some rational boundaries, before any meaningful settlement could be discussed. Moreover, while a primary insurer in this case is liable for but a few million dollars, the excess carrier could be liable for as much as $25 million or even $50 million. Under these circum-

stances, the reasonable rule would be that the excess carrier is entitled to demand real proof that its limits are implicated. As National Union's claims handler said:

> All along I wanted documentation on the damages sustained by the plaintiffs. I had received forecasts, estimates based on a sampling that was conducted, the Sullivan report, but I did not receive documentation backing that information. And it is my job to analyze the documentation and come to a conclusion and I had not received that information, so therefore I could not offer any amount towards a settlement, including the fact, you can add that, too, is the fact that there were exhaustion issues which we needed to determine and clarify before our policy came into play.

The majority's approach insists that the insurer and the policyholder engage in professional chat even when there is nothing to chat about. Foisting this obligation on the excess insurer is a brand new rule that imposes completely unexpected and unnecessary costs on the excess insurer, which will inevitably percolate to insureds.

## VI

There is no reason to defend National Union's business manners and sometimes poor business practices. Undoubtedly, it should not have misrepresented to its insured that it needed to purchase a new extended policy when in fact the insured had an adequate policy for the extended period. It probably should have made clear to ABT that it did not agree with the assertions made by a junior associate attorney in his draft of an advisory letter. It probably should have communicated in more detail with its insured. All of these are matters of business courtesy, and, in the case of the misrepresentation, a matter of legal responsibility. Nothing in National Union's behavior, however, is a basis for forfeiting its benefit in the crystal clear language of its insurance contract with ABT.

The majority's decision today ignores the straightforward language of the insurance policy governing this case. In doing so, it seriously undermines the expectations of commercial actors who expect to be able to rely on the terms of the agreements they reach. It also strikes

a heavy blow against the freedom of contract that underlies a market economy. Finally, it puts in question a long line of our cases resolving contractual issues, in which we have celebrated construing contracts in accordance with their terms.

I would reverse the judgment of the district court.